NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11679

COMMONWEALTH  vs.  MANUEL ARZOLA.


Suffolk.     November 6, 2014. - March 4, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Identification.  Evidence, Identification, Blood sample, Buccal swab.  Deoxyribonucleic Acid.  Search and Seizure, Clothing, Expectation of privacy, Warrant, Blood sample, Buccal swab, Probable cause.  Probable Cause. Constitutional Law, Privacy, Probable cause, Blood test. Privacy.



Indictments found and returned in the Superior Court Department on January 11, 2011.

Pretrial motions to suppress evidence and to compel the provision of a deoxyribonucleic acid sample by means of a buccal swab were heard by Thomas A. Connors, J., and the cases were tried before Thomas E. Connolly, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Katherine Essington for the defendant.
Donna Jalbert Patalano, Assistant District Attorney, for the Commonwealth.
Ian Stone, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

Kirsten V. Mayer, John J. Reynolds III, Sara Perkins Jones, Matthew R. Segal, & Jessie J. Rossman, for American Civil Liberties Union Foundation of Massachusetts, amicus curiae, submitted a brief.

GANTS, C.J.  The defendant was convicted by a Superior Court jury of assault and battery by means of a dangerous weapon and assault and battery.[1]  The defendant appealed, and we transferred the case here on our own motion.  On appeal, the defendant contends that the motion judge erred in denying a motion to suppress the victim's out-of-court eyewitness identification of the defendant, where the victim had told the police that the assailant wore a gray shirt and the defendant was the only person shown wearing a gray shirt in the photographic array.  The defendant also argues that deoxyribonucleic acid (DNA) evidence identifying the victim as the source of blood found on the defendant's shirt should have been suppressed, because the DNA analysis of the bloodstain constituted a search that could only be conducted lawfully with a warrant supported by probable cause, and no warrant had been

---

[1] The defendant was found not guilty of armed robbery.  He was sentenced to from five to seven years in State prison on the conviction of assault and battery by means of a dangerous weapon, and to from three years of probation on the conviction of assault and battery, to commence on his release from State prison.

obtained.  We find no error and affirm the defendant's convictions.[2]

Background.  In the early morning of August 23, 2010, the victim, Mauricio Arevalo, was walking to his home in Chelsea when a man seated on a bench asked him for money and cigarettes. The victim continued walking for another two or three blocks when someone came from behind him and held a knife to his back, demanding he give up his possessions.  The victim surrendered his wallet and cellular telephone before the assailant shoved him to the ground and stabbed him in the neck and shoulder area. From the ground, the victim turned his head and observed the assailant, whom he recognized as the same person who had asked for money and cigarettes.  The victim briefly followed the assailant but then stopped at a firehouse for assistance with his wounds.

Chelsea police Officer Robert Hammond met the victim at the firehouse before he was taken to the hospital.  The victim described the assailant as a heavy-set Hispanic male, approximately five feet, ten inches to six feet tall, wearing a gray shirt, dark-colored jeans, and possibly a hat.  Shortly after an ambulance arrived, another officer alerted Officer

---

[2] We acknowledge the amicus briefs submitted by the Committee for Public Counsel Services and by the American Civil Liberties Union Foundation of Massachusetts.

Hammond that a man fitting the victim's description of the assailant had been stopped about two blocks away from the crime scene. Officer Hammond went to where the defendant had been stopped and observed that he matched the victim's general description.[3] After learning that the defendant had an outstanding warrant, Officer Hammond arrested him on the warrant and transported him to the Chelsea police station.

During booking, the defendant was asked to empty his pockets and, as he reached into them, Officer Hammond observed that the defendant had a stain on the left sleeve of his gray shirt. Believing the stain to be blood, Officer Hammond asked the defendant if he had any injuries that might have caused the stain. The defendant responded that he was not injured, and no wounds were found on him. Before placing the defendant in a cell, Officer Hammond seized the shirt as evidence of the alleged armed robbery and assault of the victim, although the defendant was not yet under arrest for those crimes. Because the defendant would have access to a sink and a toilet with running water in his cell, Officer Hammond was concerned that the defendant might wash away the stain if the shirt were not seized.

---

[3] No showup identification procedure was conducted with the victim because he needed to be transported by ambulance to the hospital.

The following day, the victim met with Detective Michael Noone and described the assailant as a Hispanic male, about five feet, ten inches tall, with a heavy build and short hair, and wearing a gray sweatshirt. Detective Noone created an array of eight photographs, including the defendant's booking photograph. When choosing fillers for the array, he used a computer program that searched a database of photographs that matched the defendant's race and ethnicity, gender, height, weight, and age group. Detective Noone then selected people who looked similar to the defendant. Each of the filler photographs depicted a Hispanic male in the defendant's age group, with a heavy build and a similar complexion to the defendant's. The photographs themselves showed only each person's face and a small portion of the upper torso.

Detective Noone asked Officer Jose Torres, Jr., who was not involved in the investigation, to conduct the eyewitness identification procedure. Before Officer Torres took the victim into a separate room, Detective Noone read the victim the Chelsea police department form used to prepare eyewitnesses for viewing a photographic array.[4] In the separate room, Officer

---

[4] Among other advisements, the form notifies eyewitnesses that the perpetrator may or may not be in the array; that it is as important to clear the innocent as to identify the guilty; that the Chelsea police would continue to investigate the crime

Torres began showing each photograph one-by-one for five to ten seconds. When he displayed the fourth photograph, which depicted the defendant, the victim stopped him and stated, "That's the man; I'm one hundred percent sure." The victim explained that he identified that person as his assailant based on the person's hair and complexion, and added that he could not forget the assailant's eyes.

After a grand jury indicted the defendant, the Commonwealth moved for an order requiring the defendant to produce a DNA sample by means of a buccal swab. The Commonwealth explained that the victim had submitted a DNA sample to compare with the DNA from the bloodstain on the defendant's shirt, and that it was necessary to obtain a DNA sample from the defendant in order to exclude the defendant as the source of the blood. The motion judge (who was not the trial judge) allowed the Commonwealth's motion, finding probable cause to believe that the defendant committed the crimes of armed robbery and assault and battery by means of a dangerous weapon, and that the sample would probably provide evidence relevant to the defendant's guilt. At trial, Kara Tremblay, the chemist who analyzed the defendant's shirt, testified to her opinion that the DNA profile obtained from the

---

regardless of whether a suspect were identified; and that if an identification is made, the witness should signify the level of certainty.

bloodstain on the shirt matched the victim and did not match the defendant.[5]

Discussion. 1. Eyewitness identification procedure. The motion judge conducted an evidentiary hearing on the defendant's motion to suppress eyewitness identification evidence. In denying the motion, the judge found that the computerized process by which the filler photographs were selected was intended to ensure that no photograph stood out, and that, in fact, the seven other photographs showed men of a similar age, complexion, build, and hairline. Regarding the defendant's gray shirt, the judge found that (1) the gray shirt was only one of several descriptive features mentioned by the victim; (2) the photographs themselves showed a very small portion of the person's shirt; and (3) the victim explicitly stated that he made the identification based on the defendant's facial features, hair, complexion, and eyes.

"When reviewing the denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, but we conduct an independent review of [the] ultimate

---

[5] Kara Tremblay also testified that the probability of a randomly selected unrelated individual having the deoxyribonucleic acid (DNA) profile matching the bloodstain profile was approximately 1 in 107.9 quadrillion in the Caucasian population, 1 in 262.6 quadrillion in the African-American population, 1 in 76.98 quadrillion in the Hispanic population, and 1 in 104.6 quadrillion in the Asian population.

findings and conclusions of law." Commonwealth v. Perkins, 450 Mass. 834, 841-842 (2008).  To prevail on a motion to suppress an eyewitness identification, "the defendant must show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law."  Commonwealth v. Cavitt, 460 Mass. 617, 632 (2011), quoting Commonwealth v. Miles, 420 Mass. 67, 77 (1995).  Here, as the motion judge found and as we confirmed from our own review of the photographic array, the men depicted were reasonably similar in their features and physical characteristics, including their hair length, skin complexion, age, and physical build.  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 795 (2009).  Although the defendant was the only person shown wearing a gray shirt, the focal point of the photograph was the defendant's face, and the gray shirt was not distinctive apart from its color.  See Commonwealth v. Montez, 450 Mass. 736, 755-756 (2008) (although defendant was only person shown wearing hooded sweatshirt, which was mentioned in witness's description of assailant, defendant's hooded sweatshirt was "a generic type" and "defendant's photograph [did] not stand out as distinctive in any unnecessarily suggestive way").

"Although we disapprove of an array of photographs which distinguishes one suspect from all the others on the basis of some physical characteristic, we have sustained numerous such identifications when it is clear that the victim did not select the photograph on that basis." Commonwealth v. Melvin, 399 Mass. 201, 207 n.10 (1987). Here, the witness stated that he identified the defendant based on his hair, complexion, and eyes; the gray shirt was not mentioned as a factor that contributed to the identification. Compare Commonwealth v. Mobley, 369 Mass. 892, 896 (1976) (defendant's distinctive feature of wearing hat was "neutralized by the witness's unequivocal testimony . . . that [in substance] he was not looking for a hat when he examined the pictures"), with Commonwealth v. Thornley, 406 Mass. 96, 99-100 (1989) (identifications suppressed as impermissibly suggestive where defendant was only person in array who was wearing eyeglasses and eyewitnesses testified that eyeglasses were "significant factor" in making identifications). We conclude that the judge did not err in denying the motion to suppress eyewitness identification evidence.

2. DNA profile. Before trial, the defendant moved to suppress the bloodstained shirt and any evidence deriving from it as the fruit of an unlawful seizure. The motion judge denied

the motion, concluding that Officer Hammond lawfully seized it in plain view, because (1) he had a legal right to be conducting the booking process when the stain was discovered; (2) the stain was found inadvertently, as the defendant was being booked on an unrelated warrant; and (3) the incriminating character of the object was immediately apparent where the police already had knowledge of the assault of the victim, and the defendant matched the assailant's description.[6]

On appeal, the defendant does not challenge the seizure of the shirt, the court-ordered buccal swab for a known sample of the defendant's DNA, or the subsequent analysis of the defendant's known sample. Rather, the defendant argues that the DNA analysis of the bloodstained shirt was itself a search that required a warrant, even where the shirt was lawfully seized in plain view. Because this claim was not raised in the motion to suppress, we ordinarily would consider it waived. See Commonwealth v. Silva, 440 Mass. 772, 781-782 (2004). However, we shall exercise our discretion to consider the claim, in order to determine whether there was an error that created a substantial risk of a miscarriage of justice. See Commonwealth

---

[6] The motion judge also found that the police "may well have had" probable cause to arrest the defendant for the alleged robbery and assault, thus enabling them to seize the shirt as a search incident to a lawful arrest.

v. Vuthy Seng, 436 Mass. 537, 550, cert. denied, 537 U.S. 942 (2002), S.C., 456 Mass. 490 (2010); Commonwealth v. Johnson, 46 Mass. App. Ct. 398, 400 (1999).  The record before us is sufficient to resolve the defendant's claim, the matter has been fully briefed (including by the amici), and we transferred this case from the Appeals Court to address this novel issue.  See Commonwealth v. Daniel, 464 Mass. 746, 755 (2013); Commonwealth v. Bettencourt, 447 Mass. 631, 633-634 (2006).  Given these considerations, we shall proceed to address the claim on the merits.

Before determining whether the DNA analysis of the defendant's shirt constituted a search that required a warrant, we first clarify the nature and scope of the DNA analysis at issue in this case.  Here, the shirt was known to be worn by the defendant, but the source of the bloodstain was unknown, meaning the bloodstain was treated as an unknown DNA sample.[7]  Tremblay testified that she examined sixteen loci on the unknown DNA sample, which were "chosen by the [Federal Bureau of Investigation (FBI)] . . . [b]ecause they are highly variable

---

[7] Tremblay testified that she treated the sample from the defendant's shirt as an "unknown" or "question" sample, which she defined as evidence taken from a crime scene.

between individuals" and the "most discriminating."[8]  After the
defendant's known sample was provided through the court-ordered
buccal swab, and the victim voluntarily provided a known sample
of his DNA, Tremblay compared the DNA profile from the unknown
sample with the victim's and the defendant's known profiles.
Based on the record before us, we conclude that this DNA
analysis was conducted for the sole purpose of identifying the
source of the unknown sample.

---

[8] The Federal Bureau of Investigation (FBI) generally
requires that a minimum of thirteen "Core" loci be tested for
inclusion in the Combined DNA Index System (CODIS).  See FBI,
Frequently Asked Questions (FAQs) on the CODIS Program and the
National DNA Index System, available at
http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-
and-ndis-fact-sheet [http://perma.cc/X76V-TXZL] (last visited
Mar. 2, 2015).  Tremblay tested the thirteen Core loci,
Amelogenin (a gene used to determine sex), and two additional
loci, both of which are commonly tested along with the thirteen
Core loci.  See J.M. Butler & C.R. Hill, Biology and Genetics of
New Autosomal STR Loci Useful for Forensic DNA Analysis, in
Forensic DNA Analysis:  Current Practices and Emerging
Technologies 183 (J.G. Shewale & R.H. Liu eds., 2014).  These
loci, other than Amelogenin, are generally believed not to
contain personal genetic information.  See United States v.
Mitchell, 652 F.3d 387, 400-401 (3d Cir. 2011), cert. denied,
132 S. Ct. 1741 (2012).  See also Maryland v. King, 133 S. Ct.
1958, 1966-1967 (2013) (loci tested in DNA profiling "useful and
even dispositive for purposes like identity"); Boroian v.
Mueller, 616 F.3d 60, 65-66 (1st Cir. 2010) (Core loci "not
associated with any known physical or medical characteristics"
[citation omitted]).  The resulting DNA profile was essentially
a set of numbers corresponding to each locus.  See Boroian,
supra at 66 (DNA profile is "represented as a series of
digits").  The analysis of Amelogenin only revealed "XY" to
indicate a male.

Whether the DNA analysis in this case was a "'search' in the constitutional sense . . . depends on whether the [Commonwealth's] conduct has intruded on a constitutionally protected reasonable expectation of privacy." Commonwealth v. Lopez, 458 Mass. 383, 389 (2010). We recognize that the DNA found in the bloodstain could potentially reveal more information than the identity of the source, including the source's ancestry and predisposition to medical or psychiatric conditions. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617-618 (1989) (chemical analysis of biological samples may reveal "a host of private medical facts"); United States v. Mitchell, 652 F.3d 387, 412-413 (3d Cir. 2011), cert. denied, 132 S. Ct. 1741 (2012) ("DNA samples may reveal private information regarding familial lineage" [citation omitted]). See also Raynor v. State, 440 Md. 71, 103 (2014) (Adkins, J., dissenting) ("With today's technology, scientists have the power to discern [from DNA] genetic traits, behavioral tendencies, propensity to suffer disease or defects, other private medical information, and possibly more"). But when limited to these sixteen loci, DNA analysis "does not show more far-reaching and complex characteristics like genetic traits." Maryland v. King, 133 S. Ct. 1958, 1966-1967 (2013). Apart from the source's sex, the DNA analysis of the unknown sample taken from the

defendant's lawfully seized shirt revealed nothing more than the identity of the source, which is what an analysis of latent fingerprints would have revealed (albeit with less accuracy) had they been found on the clothing.  Therefore, the DNA analysis was no more a search than an analysis of latent fingerprints would be.  See Boroian v. Mueller, 616 F.3d 60, 66 (1st Cir. 2010) (DNA profile provides genetic fingerprint to uniquely identify individual but does not provide additional information about that person); Raynor, 440 Md. at 96 ("DNA testing of the [thirteen] identifying . . . loci within genetic material, not obtained by means of a physical intrusion into the person's body, is no more a search for purposes of the Fourth Amendment [of the United States Constitution], than is the testing of fingerprints").  See also United States v. Dionisio, 410 U.S. 1, 15 (1973), quoting Davis v. Mississippi, 394 U.S. 721, 727 (1969) (fingerprinting does not involve "probing into an individual's private life and thoughts that marks an interrogation or search").

A defendant generally has a reasonable expectation of privacy in the shirt he or she is wearing, but where, as here, the shirt is lawfully seized, a defendant has no reasonable expectation of privacy that would prevent the analysis of that shirt to determine whether blood found on it belonged to the

victim or to the defendant. See Raynor, 440 Md. at 92 (defendant "does not possess a reasonable expectation of privacy in the identifying characteristics of his DNA"). See also State v. Athan, 160 Wash. 2d 354, 374 (2007) ("There is no subjective expectation of privacy in discarded genetic material just as there is no subjective expectation of privacy in fingerprints or footprints left in a public place"). Requiring police to obtain a warrant whenever they seek to analyze lawfully seized evidence for the sole purpose of identifying the unknown source of a genetic fingerprint would "impose[] substantial burdens on law enforcement without vindicating any significant values of privacy."[9] Commonwealth v. Varney, 391 Mass. 34, 39 (1984), quoting Robbins v. California, 453 U.S. 420, 429 (1981) (Powell, J., concurring in the judgment). See Commonwealth v. Robles,

---

[9] An amicus notes that DNA analysis of the shirt potentially could reveal the identities of persons who have touched the defendant's shirt, thereby intruding into his interest in keeping his associations private. We do not address whether our analysis would differ if the purpose of the DNA analysis were not to investigate the commission of a crime, but instead to determine the identity of persons intimately involved with the defendant. We note, however, that DNA analysis of blood found on a defendant's lawfully seized clothing, for the sole purpose of identifying the unknown source of blood, is unlikely to constitute an "undue intrusion" into a defendant's intimate relationships. Roberts v. United States Jaycees, 468 U.S. 609, 617-618 (1984). The mere presence of another person's DNA on a defendant's clothing does not reveal a significant amount of information or detail about the nature of the relationship between the defendant and the source of the DNA.

423 Mass. 62, 65 n.8 (1996) (if lawfully seized, police need not obtain warrant to conduct chemical analysis of bloodstained coat).

Although we recognize that the science of DNA analysis may evolve and enable DNA profiling to uncover from these loci information more personal than the identity and sex of its source, the loci tested in this case "are not at present revealing information beyond identification" and sex. King, 133 S. Ct. at 1979, quoting Katsanis & Wagner, Characterization of the Standard and Recommended CODIS Markers, 58 J. Forensic Sci. S169, S171 (2013).  See Boroian, 616 F.3d at 68-69 (government use of DNA profile for more than identification "merely [a] hypothetical possibilit[y]").  If the Commonwealth were to obtain more than identification and sex information from these loci, use the DNA profile for any purpose other than identifying the unknown source of the sample, or analyze different loci that contained more personal genetic information, we would have to revisit the question whether such DNA analysis is a search in the constitutional sense.  See King, supra ("If in the future police analyze samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here"); Mitchell, 652

F.3d at 408 ("Should technological advancements change the value of [loci analyzed in a DNA profile], reconsideration of our Fourth Amendment analysis may be appropriate").  Cf. Riley v. California, 134 S. Ct. 2473, 2490, 2493 (2014) (warrant is generally required for search of cellular telephone, even when lawfully seized incident to arrest, because "many of the more than [ninety per cent] of American adults who own a [cellular telephone] keep on their person a digital record of nearly every aspect of their lives -- from the mundane to the intimate").

The defendant's argument rests heavily on United States v. Davis, 690 F.3d 226, 250 (4th Cir. 2012), where the court concluded that the police conducted an unreasonable search in violation of the Fourth Amendment when they extracted the defendant's DNA profile from his lawfully seized clothing and tested it as part of a murder investigation.[10]  In Davis, the defendant's clothing was seized as evidence while he was in the hospital as a gunshot victim, and his DNA profile was later obtained from the bloodstains on his pants in order to compare

---

[10] The Fourth Amendment violation, however, did not result in the suppression of the DNA evidence because the court concluded that the exclusionary rule should not apply in these circumstances under the "good faith" exception established in United States v. Leon, 468 U.S. 897, 919-920 (1984).  See United States v. Davis, 690 F.3d 226, 251, 257 (4th Cir. 2012).

it with an unknown DNA profile from an unrelated homicide.[11]  Id. at 230-231.  After the defendant was excluded as the source of the evidentiary sample from that murder, the police retained his DNA profile and included it in their local DNA database, where it triggered a "cold hit" with another sample from a different homicide crime scene.  Id. at 229, 231-232.  The court concluded that the defendant's clothing was lawfully seized in plain view. Id. at 239.  However, the court held that the defendant had an expectation of privacy in his DNA that was implicated once the police extracted the DNA from his clothing and obtained his DNA profile.  Id. at 246.

In contrast with the instant case, the police in Davis treated the DNA sample on the defendant's clothing as the defendant's known sample, and created a DNA profile in order to compare it with other unknown samples obtained from various crime scenes.  Id. at 231-233.  The court's conclusion that the defendant "retained a reasonable expectation of privacy in his DNA profile" was premised on the finding that the sample from his clothing was known to contain the defendant's DNA.  Id. at

---

[11] Because the parties' briefs and the record were "devoid of any factual basis" for concluding that the defendant was involved in the murder, Davis, 690 F.3d at 250, the court presumed that the police obtained the defendant's DNA profile based on suspicions that amounted to less than probable cause. Id. at 231 n.6, 250.

248.  Even if we were to accept the Davis court's reasoning with regard to a DNA sample known to belong to the defendant, a defendant does not have a reasonable expectation of privacy in a DNA profile from an unknown sample that was taken from lawfully seized evidence.[12]

Moreover, we doubt that the Fourth Amendment reasoning of the Davis court will be adopted by the United States Supreme Court.[13]  The Davis court never fully addressed the limited scope of the DNA analysis:  to develop a DNA profile that would serve as a genetic fingerprint to be compared with unknown DNA profiles.  See id. at 240 n.22 (declining further to discuss science of DNA profiling after noting that some courts analogize

---

[12] We note that where we have concluded that a known DNA sample of a defendant was lawfully obtained without a court order, we have not required a search warrant to analyze the DNA from that sample to compare its profile with the profile from an unknown sample in the criminal investigation.  See Commonwealth v. Bly, 448 Mass. 473, 489-491 (2007) (no warrantless search or seizure occurred where police retrieved cigarette butts and water bottle used by defendant during interview in order to obtain known DNA sample, because defendant failed "to manifest any expectation of privacy in the items whatsoever"); Commonwealth v. Ewing, 67 Mass. App. Ct. 531, 539-540 (2006) (defendant had no expectation of privacy in cigarette butts that he abandoned and that were used to obtain known DNA sample).  We also note that the defendants in Bly and Ewing did not claim that, if the items were lawfully collected, a search warrant was required to conduct a DNA analysis of the known sample.

[13] The Davis court acknowledged that the "issue of a person's reasonable expectation of privacy in his DNA . . . has not yet been addressed by the Supreme Court."  Davis, 690 F.3d at 240.

DNA to fingerprints while others recognize limitations of that analogy).  The Supreme Court's subsequent opinion in King, 133 S. Ct. at 1979, noted that the loci that comprise a DNA profile "come from noncoding parts of the DNA that do not reveal . . . genetic traits," and that the sole purpose of DNA profiling is to generate "a unique identifying number against which future samples may be matched."  Although the Court was addressing the suspicionless collection of a DNA sample through a buccal swab of certain arrestees, rather than the analysis of such a sample, we think it is likely that the limited information provided by a DNA profile and the limited purpose of identification will lead the Supreme Court to reach a conclusion that is different from that of the Davis court.  See Raynor, 440 Md. at 90, petition for cert. filed, U.S. Supreme Ct., No. 14-885 (Jan. 19, 2015) ("The Davis Court's conclusion that the DNA testing at issue in that case constituted a Fourth Amendment search rested on what may now be a faulty premise, given the discussion in King that DNA analysis limited to the [thirteen Core] loci within a person's DNA discloses only such information as identifies with near certainty that person as unique").

We conclude that where, as here, DNA analysis is limited to the creation of a DNA profile from lawfully seized evidence of a crime, and where the profile is used only to identify its

unknown source, the DNA analysis is not a search in the constitutional sense. Therefore, no search warrant was required to conduct the DNA analysis of the bloodstain from the defendant's clothing that revealed that the victim was the source of the blood.

Conclusion. Because we find no error, the defendant's convictions are affirmed.

So ordered.