PLOUDE, COMMONWEALTH vs., 101 Mass. App. Ct. 845

 
 COMMONWEALTH vs. KEVIN PLOUDE.

101 Mass. App. Ct. 845
 February 18, 2022 - November 10, 2022

Court Below: Superior Court, Bristol County
Present: Rubin, Wolohojian, & Blake, JJ.

 

No. 20-P-1310.

Identification. Constitutional Law, Identification. Due Process of Law, Identification. Evidence, Identification, Photograph. Practice, Criminal, Motion to suppress, Identification of defendant in courtroom.

A Superior Court judge erred in denying a criminal defendant's pretrial motion to suppress an eyewitness's out-of-court identification of the defendant from a photographic array, where, although the defendant failed to demonstrate that a police officer's statement to the witness prior to the identification was impermissibly suggestive, the defendant nevertheless met his burden of showing that the array itself was unnecessarily suggestive and conducive to irreparable misidentification, given that the presentation of the photographs did nothing to obscure the fact that the defendant was the only man in the array shown with tattoos, a distinctive feature that the witness noticed about the individual he saw committing a crime. [850-854]

Indictments found and returned in the Superior Court Department on July 27, 2017.

 A pretrial motion to suppress evidence was heard by Thomas J. Perrino, J.

 An application for leave to prosecute an interlocutory appeal was allowed by David A. Lowy, J. in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

 Nicholas Athanassiou, Committee for Public Counsel Services, for the defendant.

 Daniel J. Walsh, Assistant District Attorney, for the Commonwealth.

 WOLOHOJIAN, J. Frank Tavares saw a man he did not know break into his work truck. Tavares observed (among other things) that the man (who was shirtless) had several tattoos "all over his body," including on his back, shoulder, and neck. The police came to believe that the defendant might be the unknown man Tavares observed, and compiled a photographic array (photo array) 

 Page 846 

consisting of eight photographs, including one of the defendant. Of the eight men in the photographs, only the defendant was shown with tattoos, which appeared on both sides of his neck. Tavares identified the defendant as the person who broke into his truck. What is before us in this interlocutory appeal is whether the defendant's motion to suppress Tavares's identification of the defendant from the photo array (as well as any future in-court identification Tavares might make) was properly denied. [Note 1] We reverse the order denying the defendant's motion to suppress and remand the case for further proceedings.

 Background. [Note 2] While inside Lou's Bakery in Fall River, Tavares saw an unknown white man break into his work truck, which was parked right outside the door of the bakery. Tavares immediately left the bakery and confronted the man, who was hunched over the passenger's seat of the truck. Tavares grabbed the man and asked what he was doing. The man responded by saying that he thought it was his friend's truck, that he was "whacked out," and that he had taken a "bunch of pills" that morning. Tavares saw that the man was carrying a medium-sized bag with various items inside. A bystander observing the confrontation asked Tavares whether she should call the police. When Tavares answered affirmatively, the man reached into the bag, pulled out a box cutter, and threatened to stab Tavares. In order to avoid escalating the situation, Tavares let the man go.

 When a police officer from the Fall River police department (department) arrived, Tavares described the unknown assailant as a light-skinned or white man, approximately five feet, five inches tall, weighing between 140 and 160 pounds, with black hair, scruffy facial hair, a skinny build, and several tattoos all over his arms and body, including on his neck. Tavares said that the man wore black sweatpants, black sneakers, and white shorts or underwear, and that he carried a black shirt in his right hand.

 The man left behind the bag he had been carrying. It contained many random items, leading the officer to believe that the items 

 Page 847 

had been stolen earlier. Among the items in the bag was a cell phone, which the officer was able to unlock using a random swiping gesture on the phone's lock screen. The phone contained several "selfie" photographs of a man matching the description provided by Tavares. After obtaining a search warrant later that same day, the police extracted information from the cell phone showing that it belonged to the defendant. A search of the department's internal database revealed the defendant's address and what appeared to be the same selfie photograph the officer had seen on the phone. The officer then called Tavares and said that the police thought they knew who the perpetrator was, based on the cell phone that had been left at the scene, and the officer asked Tavares to come to the station to look at a photo array.

 The officer assembled an array of eight photographs: the defendant, and seven "fillers." The filler photographs were generated by entering the following search criteria into the department's computer system: unshaven white male, with medium body build, age between twenty-two and thirty, with a light complexion, weighing between 140 and 170 pounds, and having a height of between five feet, five inches, and five feet, nine inches. The search produced eleven photographs, from which the officer picked seven based on whether they matched the description Tavares had given him of the suspect. [Note 3]

 The defendant's photograph showed him with tattoos on both sides of his neck, with the one on the left side being more visible. That tattoo showed a filigree type pattern. The tattoo on the other side was not as large or visible, and its pattern could not be discerned. None of the men shown in the filler photographs had visible tattoos. Although Tavares had described the unknown man as having facial hair, the photograph of the defendant in the array showed him without facial hair. All of the men in the filler photographs had facial hair to some degree.

 The officer knew that the department had a policy stating that if a suspect has a distinctive feature, the photographs in the array should be adjusted so that none stands out. Thus, for example, the distinctive feature could be added to each photograph or it could be concealed (with all photographs showing a similar redaction mark). The officer knew that Tavares had described the suspect as having neck tattoos, that the defendant's photograph showed neck 

 Page 848 

tattoos, and that none of the filler photographs showed tattoos. The officer had concerns about this, and so he printed the photographs in black and white to try to "neutralize" the tattoos. Although the officer had the ability either to add similar tattoos to the filler photographs, or to conceal the tattoos on the defendant's photograph, the officer chose to do neither.

 The photo array was conducted by a "blind" presenter, i.e., someone with no familiarity with the case. Before being shown the array, Tavares was read the department's standard "photo and live lineups witness preparation form," which included the following warnings and instructions:

"1. In a moment I am going to show you a group of photographs and/or individuals.

"2. This group of photographs . . . may or may not contain a picture of the person who committed the crime now being investigated.

"3. Regardless of whether you make identification, the Fall River Police will continue to investigate the incident.

"4. It is just as important to clear innocent persons from suspicion, as it is to identify the guilty parties.

"5. Keep in mind that individuals may easily change hairstyles, beards and moustaches.

"6. Also, photographs may not always depict the true complexion of a person. The complexion may be lighter or darker than actually shown in the photograph.

"7. Photographs are in a random order. I will show you each photograph sequentially (i.e., one at a time).

"8. View all photos . . . and take as much time on each as needed.

"9. If you recognize anyone as you look at the photographs . . . , please tell me which photograph . . . you recognize and how you recognize the individual.

"10. Please indicate in your own words how certain you are of the identification."

Tavares positively identified the defendant from the photo array, stating, "That's him! That's the guy!" Tavares gave no confidence 

 Page 849 

level for the identification, nor did he say on which aspect(s) of the defendant's features he based his identification.

 The defendant was arrested and photographed the following day. [Note 4] The defendant's booking photograph shows that his appearance on the day of the crime differed in some respects from his appearance in the array photograph. Specifically, the booking photograph shows the defendant with obvious facial hair, and with a highly visible large tattoo of an animal's face on the front of his throat.

 The defendant moved to suppress Tavares's identification of him from the photo array on the ground that the process was "so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law," in violation of the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He also argued that Tavares's identification was unreliable and accordingly inadmissible under Massachusetts common-law fairness principles. Finally, he argued that any subsequent identification had no independent source apart from the tainted photographic array procedure and therefore should be suppressed. In response, the Commonwealth argued that the photographs were sufficiently similar that the array was not unnecessarily suggestive.

 After an evidentiary hearing at which the Commonwealth presented the testimony only of the responding officer (who had constructed, but not administered, the array), the judge concluded that despite differences among the photographs in the array, the photographs were sufficiently similar that the procedure was not "so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law" (quotation and citation omitted). Commonwealth v. Arzola, 470 Mass. 809, 813 (2015), cert. denied, 577 U.S. 1061 (2016). The judge pointed to the fact that the array was compiled by searching an in-house database based on criteria provided by Tavares of the suspect. The judge considered differences in build and height among the men depicted in the array to be slight. The judge found that the "defendant's tattoos are slightly visible, [and that] the black and white rendering minimized their visibility." The judge also noted that "the defendant's most prominent, front-facing 

 Page 850 

neck tattoo was not in the photo." Although the judge determined that the officer's statement to Tavares that the police had identified a suspect because of the phone he had left behind was "better left unsaid," the judge concluded that the prearray advisement Tavares received from the blind presenter that the suspect "may or may not be in the array" decreased any suggestive impact. The judge accordingly concluded that the defendant had not shown that the array was so unnecessarily suggestive and conducive to irreparable misidentification as to violate due process. The judge also rejected the defendant's argument that the identification was unreliable such that it should be inadmissible under common-law principles. Presumably because the judge determined that the photo array was not unnecessarily suggestive, he did not reach the question of whether the Commonwealth proved by clear and convincing evidence that any subsequent identification had an independent source, nor did the judge make any findings pertaining to that question. The judge denied the defendant's motion to suppress.

 Discussion. "'In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error,' and we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing." Commonwealth v. Hoose, 467 Mass. 395, 399 (2014), quoting Commonwealth v. Contos, 435 Mass. 19, 32 (2001). We independently review documentary evidence (in this case, photographs) upon which the motion judge based his findings, see Commonwealth v. Silva-Santiago, 453 Mass. 782, 795 (2009), but we "accept subsidiary findings based partly or wholly on oral testimony, unless clearly erroneous." Commonwealth v. Tremblay, 480 Mass. 645, 646 (2018). We also "conduct an independent review of [the judge's] ultimate findings and conclusions of law." Commonwealth v. Yusuf, 488 Mass. 379, 385 (2021), quoting Commonwealth v. Almonor, 482 Mass. 35, 40 (2019). The defendant does not contend that any of the judge's subsidiary findings are clearly erroneous, and he agrees that the judge credited the testimony of the officer. Accordingly, we accept the testimony of the officer, as well as the contents of the documents (i.e., the police report, the photographs used in the array, the defendant's booking photograph, and the printout from the department's computer system showing the search criteria and results) introduced during the officer's testimony or submitted in connection with the motion to suppress. However, we independently review the judge's ultimate findings about the photographs 

 Page 851 

(such as that the photographs were similar, and that any differences among them were slight). See Silva-Santiago, supra.

 The defendant argues that the judge should have allowed his motion to suppress because the photo array was unnecessarily suggestive and conducive to irreparable misidentification for two reasons: first, because the officer told Tavares that a suspect had been identified based on the cell phone he left at the scene; and second, because the defendant was the only person shown with neck tattoos. An out-of-court eyewitness identification conducted by police is inadmissible under art. 12 "where the defendant proves by a preponderance of the evidence, considering the totality of the circumstances, that the identification is so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process." Commonwealth v. Crayton, 470 Mass. 228, 234 (2014), quoting Commonwealth v. Walker, 460 Mass. 590, 599 (2011). See Commonwealth v. Thornley, 406 Mass. 96, 98-99 (1989). The Supreme Judicial Court has stated that the phrase "totality of the circumstances," focuses on the "circumstances attending the confrontation." Commonwealth v. Vasquez, 482 Mass. 850, 858 (2019), S.C., 485 Mass. 405 (2020), cert. denied, 141 S. Ct. 2601 (2021). "This has been understood to refer to the [identification] episode itself; it does not extend to a consideration of the witness's entire connection with the case to determine whether the confrontation, although set up in such a way as to be unnecessarily suggestive, was nevertheless reliable, and therefore usable . . . ." Commonwealth v. Botelho, 369 Mass. 860, 867 (1976).

 As we have said, the defendant contends that the identification procedure here was unnecessarily suggestive because the officer told Tavares before the array that the police had identified a suspect based on the cell phone left at the scene, and because the defendant was the only person shown in the array with tattoos. As to the first contention, while it is true that "suggestive wording and leading questions prior to participating in an identification procedure can influence the process of forming a memory," Commonwealth v. Gomes, 470 Mass. 352, 373 (2015), S.C., 478 Mass. 1025 (2018), our case law does not support the defendant's argument that the officer's statement to Tavares here rendered the photographic array impermissibly suggestive. See Commonwealth v. Watson, 455 Mass. 246, 253 (2009); Commonwealth v. Melvin, 399 Mass. 201, 206 n.9 (1987); Commonwealth v. Williams, 399 Mass. 60, 67 (1987). Although the officer could (and 

 Page 852 

should) have avoided saying anything about why the police believed they had a suspect, the statement added little, if anything, to what would have naturally occurred to anyone being asked to come into the police station to view an array. In addition, whatever suggestiveness the officer's statement carried, it was offset by the warnings and instructions delivered by the blind presenter before he administered the array.

 This leads us to the tattoos. Our law "disapprove[s] of an array of photographs which distinguishes one suspect from all the others on the basis of some physical characteristic," Thornley, 406 Mass. at 100, quoting Melvin, 399 Mass. at 207 n.10, as the array in this case did. However, in two types of circumstances, we have nonetheless admitted identifications made from such an array. The first situation is where "it is clear that the [witness] did not select the photograph on that basis." Thornley, supra, quoting Melvin, supra. "A witness's unequivocal testimony that he was not relying on a distinctive feature will considerably neutralize any suggestiveness in a photographic array." Thornley, supra. Thus, in Melvin, although the defendant's photograph was the only one in the array showing a sling, the witness said that he identified "the individual, not the sling." Melvin, supra at 207. And in Arzola, although the defendant was the only person in the array shown wearing a gray shirt (a feature described by the victim), Arzola, 470 Mass. at 811-813, the victim stated he recognized him based on his "hair and complexion, and added that he could not forget the assailant's eyes." Id. at 812. The second circumstance is where the distinctive feature shown in the photographic array was not part of the original description of the suspect. Thus, in Commonwealth v. Marrero, 484 Mass. 341 (2020), although the defendant was the only person shown wearing a red shirt in the array, the "man who discharged the firearm . . . was not described as wearing a red shirt. Indeed, a witness testified that he might have been shirtless." Id. at 349. The case before us does not fall into either of these two categories; Tavares's description of the man who broke into his truck included the fact that the man had neck tattoos, and Tavares did not say that he picked the defendant's photograph based on some feature other than the neck tattoos.

 We recognize that the officer tried to minimize the effect of the tattoos by presenting the photographs in black and white. But the black and white photograph nonetheless showed that the defendant had tattoos on both sides of his neck. Although the tattoo on 

 Page 853 

the right side of the defendant's neck was small and unrecognizable in terms of what it was designed to depict, the tattoo on the left was larger, visible, and showed a filigree pattern. Moreover, even if presenting the photographs in black and white may have minimized the tattoos, it did nothing to obscure the fact that the defendant was the only man in the array shown with tattoos -- a distinctive feature Tavares noticed about the man who broke into his truck. In the circumstances, the defendant met his burden to show that the array was unnecessarily suggestive and conducive to irreparable misidentification. See Thornley, 406 Mass. at 98-99.

 The Commonwealth points to the fact that, at the time of the robbery, the defendant had additional tattoos to those shown in the array photograph, including a prominent one of an animal head on the front of his throat. From this, the Commonwealth argues that Tavares "likely would not have picked out the defendant's photo because of the missing tattoos on the front of his neck." This is another way of arguing that Tavares's identification was reliable, even if the array was unnecessarily suggestive. We agree that the defendant's tattoos in the array photograph paled in significance to the prominent tattoo on the defendant's throat shown on the booking photograph taken on the day after Tavares observed him, and that the array photograph differed in significant respects from the defendant's appearance on the day after the crime (both because of the different tattoos and because of the absence of facial hair in the array photograph). We also agree that these differences would have pointed attention away from the defendant and made Tavares's identification more reliable.

 The problem for the Commonwealth, though, is that the reliability of an identification made as a result of an unnecessarily suggestive law enforcement identification procedure "cannot save [its] admissibility" under art. 12. Commonwealth v. Johnson, 473 Mass. 594, 598 (2016). "Where a defendant shows that the procedure utilized by police to obtain an identification was unnecessarily suggestive, 'the out-of-court identification is per se excluded as a violation of the defendant's right to due process under art. 12.'" Vasquez, 482 Mass. at 858, quoting Johnson, supra at 597. See Crayton, 470 Mass. at 234-235. This differs from the United States Supreme Court's construction of the due process clause of the Fourteenth Amendment, which allows admission of an out-of-court identification that is the product of an unnecessarily suggestive procedure, provided the identification is shown 

 Page 854 

to be reliable under the totality of the circumstances. See Manson v. Braithwaite, 432 U.S. 98, 110, 113-114 (1977); Commonwealth v. German, 483 Mass. 553, 558 (2019). The Supreme Judicial Court has rejected the reliability test because it "'does little or nothing to discourage police from using suggestive identification procedures,' and . . . '[o]nly a rule of per se exclusion can ensure the continued protection against the danger of mistaken identification and wrongful convictions' arising from suggestive identification procedures." Crayton, supra, quoting Commonwealth v. Johnson, 420 Mass. 458, 468, 472 (1995).

 For these reasons, Tavares's identification of the defendant from the photo array should have been suppressed under art. 12. We need not, and do not, consider whether the result would be the same under the Fourteenth Amendment. Nor need we consider the defendant's alternate argument that Tavares's identification should be inadmissible on principles of common-law fairness.

 What remains is whether, as the defendant argues, any subsequent in-court identification of the defendant by Tavares would also be inadmissible because it lacked an independent source. "After a defendant proves that an initial identification was impermissibly suggestive, the Commonwealth bears the burden to prove, by clear and convincing evidence, that any subsequent identifications are based on an independent source." Thornley, 406 Mass. at 101. See Johnson, 473 Mass. at 598. "In determining the strength of an identification's independent source, we consider such factors as the quality of the witness's opportunity to observe the offender at the time of the crime, the amount of time between the crime and the identification, whether the witness's earlier description of the perpetrator matches the defendant, and whether the witness earlier identified another person as the perpetrator or failed to identify the defendant as the perpetrator." Id. at 601. See Botelho, 369 Mass. at 869.

 As we have already noted, the judge did not reach the question whether any subsequent identification by Tavares had an independent source, and accordingly, the judge did not make any findings bearing on the Botelho factors. We cannot ourselves engage in such fact finding in the first instance. For this reason, we remand to allow the judge to make those findings on the evidence that was introduced during the suppression hearing and, based on those findings, to decide whether any subsequent identification by 

 Page 855 

Tavares has an independent source. [Note 5]

 We accordingly reverse the order denying the defendant's motion to suppress and remand the case for further proceedings 

consistent with this opinion.

 So ordered. 

FOOTNOTES
[Note 1] The defendant also moved to suppress information obtained from a cell phone, but the denial of that motion is not before us. 

[Note 2] We recite the facts as the judge found them after conducting an evidentiary hearing, supplemented by undisputed facts that the judge implicitly credited. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). The Commonwealth presented testimony from only one witness: the responding officer, who also constructed the photo array. The defendant presented testimony from an expert, who opined regarding the reliability of identification evidence. 

[Note 3] The officer did not pick the photographs based on whether they matched the photograph of the defendant used in the array. 

[Note 4] As pertinent here, the defendant was charged with armed robbery, G. L. c. 265, § 17, and breaking and entering a motor vehicle in the daytime with the intent to commit a felony, G. L. c. 266, § 18. 

[Note 5] The Commonwealth asks that there be a rehearing and new presentation of evidence on remand. But when the defendant squarely raised the issue below, the Commonwealth forwent the opportunity to present whatever evidence (presumably the testimony of the victim) that it now wants another chance to introduce. This case is not like Commonwealth v. Watson, 455 Mass. 246 (2009), upon which the Commonwealth relies in requesting a remand to present additional evidence. In Watson, the Commonwealth's failure to present independent source evidence was the result of the judge wanting to take the issues "one step at a time." Id. at 255 n.6. Here, no such bifurcation occurred, and so we see no reason to permit the Commonwealth to expand the factual record where nothing foreclosed the Commonwealth from presenting that evidence the first time around. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.