NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12493

COMMONWEALTH  vs.  RANDALL TREMBLAY.


Suffolk.     May 10, 2018. - October 3, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, & Cypher, JJ.


Constitutional Law, Admissions and confessions, Voluntariness of
     statement, Waiver of constitutional rights, Search and
     seizure.  Evidence, Admissions and confessions,
     Voluntariness of statement, Intoxication, Scientific test.
     Waiver.  Intoxication.  Search and Seizure, Clothing.
     Practice, Criminal, Admissions and confessions,
     Voluntariness of statement, Motion to suppress, Waiver,
     Property seized at time of arrest.




     Indictments found and returned in the Superior Court
Department on March 10, 2015.

     A pretrial motion to suppress evidence was heard by Kenneth
W. Salinger, J.


     Applications for leave to prosecute interlocutory appeals
were allowed by Hines, J., and Cordy, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeals were
consolidated and reported by them to the Appeals Court.  After
review by the Appeals Court, the Supreme Judicial Court granted
leave to obtain further appellate review.


     Patrick Levin, Committee for Public Counsel Services, for
the defendant.

Janis DiLoreto Smith, Assistant District Attorney, for the Commonwealth.

LENK, J.  The defendant stands accused of murder in the first degree in connection with the beating death of a woman who had obtained a restraining order against him.  The Commonwealth appeals from an order suppressing both the statements that the defendant made during custodial interrogations and the forensic testing results obtained from his bloodstained clothing.

The motion judge heard testimony from police witnesses and watched an audio-video recording of a second custodial interrogation, which took place soon after the police realized that they inadvertently had failed to record the defendant's first interrogation.  The judge concluded that the defendant was too intoxicated during both interviews to make a knowing, intelligent, and voluntary Miranda waiver.  Consequently, the judge determined that the Commonwealth had not met its burden of proving beyond a reasonable doubt that the defendant validly waived his Miranda rights at the unrecorded first interview.  See Commonwealth v. Hoyt, 461 Mass. 143, 149 (2011).

As to the suppression of the defendant's statements, the case calls upon us first to examine unsettled aspects of the standard of review to be applied to the judge's subsidiary findings, some of which were drawn from documentary evidence.  We decline to adopt the Federal approach, which does not permit

a reviewing court to make an independent assessment of pertinent documentary evidence, and instead requires deference to all subsidiary fact findings that are not clearly erroneous. See Anderson v. Bessemer City, N.C., 470 U.S. 564, 574-575 (1985). We instead reaffirm the long-standing principle that an appellate court may independently review documentary evidence, but should accept subsidiary findings based partly or wholly on oral testimony, unless clearly erroneous. See Commonwealth v. Hoose, 467 Mass. 395, 399 (2014). In such circumstances, the case should be decided "upon the entire evidence," see Berry v. Kyes, 304 Mass. 56, 57-58 (1939), giving "due weight" to the judge's subsidiary findings when required. See Edwards v. Cockburn, 264 Mass. 112, 120-121 (1928).

In the recording of the second interrogation, the judge saw a man then so intoxicated that his level of sobriety one hour or so earlier -- the pertinent time for assessing the validity of the Miranda waiver -- could only have been much worse. The recording of the second interview thus formed part of the predicate for the judge's conclusion that the defendant had been too intoxicated at the beginning of the unrecorded first interview to give a valid waiver. Our de novo review of that documentary evidence instead reveals that, for the duration of the recording of the second interview, the defendant appeared to be lucid, coherent, responsive, and in control of his mental

faculties. Thus, the judge's findings regarding the defendant's condition during the second interview -- and, to the extent that they are premised on extrapolations from that interview, his findings concerning the defendant's capacity validly to waive his Miranda rights during the first interview -- are not supported by that evidence and cannot stand.

Mindful that the judge also made findings relating to the defendant's condition that are based on oral testimony, and to which we must defer, the case on appeal is to be decided on the "entire evidence." See Berry, 304 Mass. at 57-58. We therefore must weigh our de novo review of the second interview along with the judge's assessment of the oral testimony. Doing so presents unique challenges in these particular circumstances, where the findings focus largely on a comprehensive documentary record of the wrong time period. We do not know the extent to which the recording of the second interview may have had an impact on the judge's other factual findings and credibility determinations, or what else the judge might have found if he shared our view of the recording. Additionally, the judge failed to make factual findings or credibility determinations regarding certain material evidence. We are thus not confident that the remaining findings as to the testamentary evidence that are entitled to deference allow for meaningful review of the entire evidence in this case.

This being so, it is the better part of wisdom to remand this case so that the judge can make findings and credibility determinations regarding all pertinent evidence in light of our de novo assessment of the recording of the second interview. Cf. Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015); Commonwealth v. Isaiah I., 448 Mass. 334, 338 (2007). Depending on the findings made on remand as to the defendant's condition and level of sobriety at the pertinent time, and recognizing that intoxication alone does not preclude a valid waiver, Commonwealth v. Wolinski, 431 Mass. 228, 231 (2000), a remand will also afford the opportunity to clarify any such nexus, and allow the judge as well to determine the voluntariness of the statements.

The situation is otherwise as to the suppressed forensic testing results. The police lawfully seized the defendant's clothing incident to arrest, and thereafter did not need a separate warrant to test the clothing for the presence of human blood. See Commonwealth v. Arzola, 470 Mass. 809, 816-817 (2015), cert. denied, 136 S. Ct. 792 (2016). Accordingly, the order suppressing the results of the forensic testing of the defendant's clothing must be reversed.

1. Background. a. Findings of fact. The judge held an evidentiary hearing on the defendant's motion to suppress at which three officers testified and an audio-video recording of

the defendant's second interview was submitted.[1]  The judge did not make any explicit adverse credibility findings, but stated that he credited the officers' testimony "to the extent it [was] consistent with [his] explicit findings of fact."  The judge found as follows.  Shortly after 2 A.M. on November 18, 2014, Boston police received a 911 call stating that the victim had died at her apartment.  Her body was found, covered with a blanket, on a "very bloody" couch; her face was bruised and bloodied.  Two of the defendant's friends were in the apartment when the officers arrived, but the defendant was not present.  One friend appeared to be intoxicated; the other, who did not, had telephoned 911.

Sergeant Scott Yanovitch of the Boston police department requested a dispatch to all relevant units; the dispatch went out around 2:50 A.M.  Officer Shawn Roberts heard the dispatch

---

[1] The remaining evidence presented consisted of the defendant's Miranda waiver form, a restraining order obtained by the victim against the defendant, a video recording of the wrong interrogation room, photographs of the crime scene, and a video recording of the defendant with his friend at a Massachusetts Bay Transportation Authority (MBTA) station more than four hours before he was interrogated.  At the hearing, the witnesses also referenced video surveillance from a liquor store more than five hours before the defendant was interrogated, but that footage was not played or submitted.  The judge did not discuss these other pieces of evidence in his findings.  Although the record on appeal does not include the video recordings of the defendant with his friend at the MBTA station and the liquor store, these materials would not aid our analysis, because they were recorded four or five hours before the defendant's first interrogation.

and recognized the address because he had responded there to some previous complaints by the victim of domestic violence by the defendant.  Roberts used his mobile data terminal to perform a search of the prior police reports regarding that address, found the defendant's name, and checked his criminal record.  Roberts discovered that an active restraining order was in place requiring the defendant to stay away from the victim's residence, and that there was an outstanding warrant to arrest the defendant for failing to register with the Sex Offender Registry Board.  Roberts also examined the defendant's booking photographs.

Over the next hour or so, Yanovitch saw a man who was later identified as the defendant "hanging out" near the victim's apartment.  The first time, Yanovitch briefly stepped outside the victim's apartment to get some fresh air and saw the defendant walk past him, talking and mumbling to himself.  The second time, when Yanovitch escorted one of the defendant's friends outside the apartment to smoke a cigarette, the defendant approached and asked the friend for a cigarette.  Around the same time, Roberts completed his research and contacted Yanovitch over the police radio to tell him what he had learned about the defendant.  Yanovitch asked Roberts to come to the scene to determine if the friend that he had escorted outside to smoke was the person Roberts had researched.

Roberts arrived, confirmed that the friend was not the same individual, and left.

Back inside the apartment, Yanovitch heard the defendant, standing on the sidewalk, yelling loudly; he was yelling statements such as "What's going on in there?"; "I know what happened"; and "She was my friend." Yanovitch went outside again. The defendant approached him, asked, "What's going on in there?" and repeated, "She was my friend." Yanovitch asked the defendant for his name, and the defendant responded, "What, are you going to run me?" Yanovitch then asked Roberts to return to the scene to determine if the defendant was the person he had researched; by this time it was approximately 3:40 A.M.

When Roberts returned and approached the defendant, Roberts smelled alcohol. He identified the defendant and placed him under arrest pursuant to the outstanding warrant. The defendant stated that he had paperwork showing that the arrest warrant had been recalled, but the paperwork concerned a different warrant. Roberts read the defendant the Miranda rights; the defendant did not indicate whether he understood. Roberts and another officer then drove the defendant to Boston police headquarters. During the drive, the defendant repeatedly asked if he would be released because the warrant was a mistake; he said nothing about the victim.

Sergeant Detective Michael Stratton interviewed the defendant for approximately one hour, starting at around 4:30 A.M., while Roberts observed.  Stratton told the defendant that they were being recorded, but, for the duration of the defendant's interview, the officers inadvertently recorded a different interrogation room.  Stratton read the defendant the Miranda rights from a preprinted form, and the defendant initialed the form and signed his name.[2,3]  The defendant then made statements implicating himself in the victim's death; the defendant said that he and the victim had gotten into an argument and that he had hit her in the head twelve to fifteen times.  The defendant said that he "got her good," and, "I think I killed her."

The defendant also said that, when he woke up the next morning, the victim's body was cold and he thought she was dead. He stated that he then left the apartment and found his friend,

---

[2] The defendant's waiver form states that his waiver was obtained at 5 A.M.  The judge credited the time stamp on the recording that was taken of the wrong interview room, however, which indicated that the first interview began at 4:30 A.M.  We defer to this finding, which also is consistent with the fact that the interview lasted for approximately one hour and was followed by a ten-minute cigarette break before the defendant was reinterviewed at 5:50 A.M.

[3] References to the "unrecorded" waiver denote the fact that the defendant's waiver process was not captured on an audio-video recording, and are not meant to suggest that the defendant failed to sign a waiver form.

and they drank beer together before returning to the victim's apartment.  Once there, the defendant mopped puddles of blood from the floor and took out the trash.  He then drank more beer, finishing the last of the beer as his other friend telephoned 911.  Throughout the interview, the defendant also repeatedly insisted that the warrant was a mistake and asked when he would be released.

When he learned of the mistake in recording, Stratton asked the defendant if he would agree to a second interview; the defendant assented, but wanted a cigarette first.  During the ten-minute cigarette break, the defendant continued to ask when he would be released.

Stratton interviewed the defendant a second time beginning at around 5:50 A.M.  This interview was audio-video recorded. The judge found that the defendant was "quite intoxicated" throughout the interview, and that Stratton knew this but did not attempt to discern the defendant's level of intoxication. The judge found that the defendant was "stumbling around and very unsteady on his feet" when he re-entered the interview room, and that he "sound[ed] drunk and seem[ed] to have trouble speaking clearly."  The defendant paid "very little attention while Stratton tried to review the Miranda form with him," and "reached across the table and started playing with Stratton's pen and papers."  The judge found that, at that point, the

defendant still did not realize that he had incriminated himself, as he was again arguing that the warrant was only a "straight warrant," a "mistake," and asking if he would be released. The defendant also made statements such as, "She's dead because of me," and, "I did whack her." The judge stated that, "[s]ince it is apparent that [the defendant] was quite intoxicated throughout the second police interrogation, the Court infers and therefore finds that he was even more drunk during the first interview."

After the second interview, Stratton arrested the defendant for murder. Stratton also seized all the defendant's clothing after he noticed apparent bloodstains on the defendant's shoes and socks. The officers had not obtained a warrant to seize or test the clothing. Every piece of clothing the defendant had been wearing tested positive for the presence of human blood.

b. Prior proceedings. The defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1, and violation of an abuse prevention order, G. L. c. 209A, § 7. He moved to suppress all statements he had made to police and all evidence seized from him. The judge allowed the motion to suppress in part. He ordered suppressed all statements the defendant made once he had been transported to the police station, but found that suppression was not required for statements made before the defendant had been transported to the

police station.  The judge found that the Commonwealth had not met its burden of demonstrating beyond a reasonable doubt that the defendant had validly waived his Miranda rights.  The judge also ordered that the results of forensic testing of the defendant's clothing be suppressed, because no warrant had been obtained to test the clothes; he denied the motion to suppress the clothing itself, on the ground that the seizure was permissible under the exigent circumstances exception to the warrant requirement.

A single justice of this court allowed the Commonwealth's petition for interlocutory review of the partial allowance of the motion to suppress.  The defendant's motion for leave to file a cross appeal of the partial denial of the motion to suppress also was allowed, and the appeals were consolidated and reported to the Appeals Court.  The Appeals Court reversed the judge's partial allowance, Commonwealth v. Tremblay, 92 Mass. App. Ct. 295, 313 (2017), and this court then allowed the defendant's application for further appellate review.

2.  Discussion.  a.  Standard of review.  "In general, in reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law" (quotation, citation, and alterations omitted).  Commonwealth v. Clarke, 461 Mass. 336, 340 (2012).

Massachusetts appellate courts have traditionally declined to defer to subsidiary findings based wholly on documentary evidence, however. See, e.g., Berry, 304 Mass. at 57-58. Because the judge's subsidiary findings rested on both testimonial and documentary evidence, we must first settle the open question whether our long-standing practice of independently reviewing documentary evidence survives in light of more recent legal developments.

i. Origins. Traditionally, "[g]reat weight is justly given to the conclusions on questions of fact of the justice who hears the case." Chase v. Hubbard, 153 Mass. 91, 92 (1891). This is because the judge "has [had] an opportunity to observe the conduct of the witnesses, their fairness and intelligence, and can judge better than the full court possibly can of the degree of credibility to be given to their testimony." Id. If a judge's subsidiary findings are drawn from documentary evidence, however, we have reasoned that "the reason of the rule largely disappears." Id. Thus, for over a century, Massachusetts appellate courts have distinguished between findings drawn from testimonial evidence and those drawn from documentary evidence. See Olivieri v. Atkinson, 168 Mass. 28, 30 (1897); Chase, supra.

Initially, this court held that, where the record consists entirely of documentary evidence, it is "proper to re-examine

the evidence, and determine if on the whole the judgment was right."  Olivieri, 168 Mass. at 30.  Later, this rule was expanded, such that, within a given case, subsidiary findings based on documentary evidence were not entitled to deference, but subsidiary findings "based wholly or partly upon oral testimony are not to be set aside unless plainly wrong."  Berry, 304 Mass. at 57-58.  Even then, however, the case "is to be decided upon the entire evidence," giving "due weight" to the judge's subsidiary findings based on testimonial evidence. Edwards, 264 Mass. at 120-121.

ii.  Rule 52 (a) of the Massachusetts Rules of Civil Procedure.  The standard of review for subsidiary findings based on documentary evidence originated in civil cases, but such cases were later relied on in the criminal context as well. See, e.g., Commonwealth v. Novo, 442 Mass. 262, 266 (2004) (citing civil cases such as Berry, 304 Mass. at 57-58, for standard of review); Commonwealth v. Wiseman, 356 Mass. 251, 256-257 (1969), cert. denied, 398 U.S. 960 (1970) (same).  Civil cases like Berry, supra, however, appear to conflict with Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996), which was adopted in 1974.  See, e.g., Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 525, cert. denied, 493 U.S. 894 (1989) (recognizing, but not resolving, conflict between traditional standard of review for findings based on documentary

evidence and rule 52 [a]); <u>Rapp</u> v. <u>Barry</u>, 398 Mass. 1004, 1005 n.3 (1986) (same).  We take this opportunity to resolve this apparent conflict, affecting the standard of review in both civil and criminal cases.

Rule 52 (a) provides, in relevant part, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."  It does not exempt findings drawn from documentary evidence.[4]

The Massachusetts Rules of Civil Procedure were "patterned on the Federal Rules of Civil Procedure."  <u>Van Christo Advert., Inc</u>. v. <u>M/A-COM/LCS</u>, 426 Mass. 410, 414 (1998).  For this reason, "[i]n construing our rules, we follow the construction given to the Federal rules absent compelling reasons to the contrary or significant differences in content" (citation and quotation omitted).  <u>Id</u>.  At the time that Mass. R. Civ. P. 52 (a) was adopted, its language was identical to the cognate Rule 52 (a) of the Federal Rules of Civil Procedure.  See <u>Chance</u>

---

[4] Nonetheless, in the four decades since the adoption of rule 52 (a), Massachusetts courts have continued the practice of reviewing de novo subsidiary findings based wholly on documentary evidence.  See, e.g., <u>Commonwealth</u> v. <u>Hoose</u>, 467 Mass. 395, 399 (2014); <u>Meschi</u> v. <u>Iverson</u>, 60 Mass. App. Ct. 678, 681 n.7 (2004); <u>Guempel</u> v. <u>Great Am. Ins. Co</u>., 11 Mass. App. Ct. 845, 848 (1981).

v. United States, 415 F.2d 330, 331 (5th Cir. 1969) (discussing prior wording of Fed. R. Civ. P. 52[a]).

Since 1985, Federal courts have not independently reviewed documentary evidence, and instead have applied the "clearly erroneous" standard to all lower court findings.[5]  See Anderson, 470 U.S. at 574-575.  See also Maine v. Taylor, 477 U.S. 131, 145 (1986) (applying Anderson, supra, to all findings of fact by Federal District Courts in criminal cases, other than ultimate findings of guilt).  The United States Supreme Court did not provide this clarification, however, until more than ten years after Massachusetts adopted rule 52 (a).  Until then, in applying Fed. R. Civ. P. 52, Federal courts were split as to whether findings based purely on documentary evidence were entitled to deference.  See Advisory Committee Notes (1985) to Fed. R. Civ. P. 52(a) (collecting cases).

---

[5] The United States Supreme Court held that the clearly erroneous standard should apply to all lower court findings, not just those involving credibility determinations, because trial judges have expertise in fact finding, and "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources."  Anderson v. Bessemer City, N.C., 470 U.S. 564, 574-575 (1985). Additionally, "the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one."  Id. at 575.  "[T]rial on the merits should be the main event . . . rather than a tryout on the road" (quotations and citation omitted).  Id.

Furthermore, one month after the Supreme Court's decision in Anderson, 470 U.S. at 574-575, the Federal rule was amended to reflect the clarification that the "clearly erroneous standard" applied even when findings were based on wholly documentary evidence. See Fed. R. Civ. P. 52(a) (amended April 29, 1985, effective August 1, 1985). Thus, Rule 52(a)(6) of the Federal Rules of Civil Procedure now states, "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility" (emphasis added). Rule 52 (a) of the Massachusetts Rules of Civil Procedure, by contrast, remains unchanged. Since the meaning of Fed. R. Civ. P. 52(a) with regard to documentary evidence was not clarified until after Massachusetts adopted rule 52 (a), and there is currently a "significant difference[] in content" between our rule and the Federal rule, we expressly decline to depart from the long-standing practice in Massachusetts of independently reviewing documentary evidence in favor of the Federal approach (citation omitted). See Van Christo Advert., Inc., 426 Mass. at 414.

We now affirm the principle that an appellate court may independently review documentary evidence, and that lower court

findings drawn from such evidence are not entitled to deference.[6] See Clarke, 461 Mass. at 340-341. By contrast, findings drawn partly or wholly from testimonial evidence are accorded deference, and are not set aside unless clearly erroneous.[7] Id. Accord Hoose, 467 Mass. at 399-400; Mass. R. Civ. P. 52 (a). The case "is to be decided upon the entire evidence," however, giving "due weight" to the judge's findings that are entitled to deference. Edwards, 264 Mass. at 120-121.

While there is no direct counterpart in the Massachusetts Rules of Criminal Procedure to Mass. R. Civ. P. 52 (a), we also defer to subsidiary factual findings in criminal cases unless they are clearly erroneous. See, e.g., Commonwealth v. Leahy, 445 Mass. 481, 485 (2005). Thus, our pronouncement that the clearly erroneous standard set forth in Mass. R. Civ. P. 52 (a)

---

[6] This principle was articulated differently in Commonwealth v. Novo, 442 Mass. 262, 266 (2004), which explained that we independently review evidence that is "reduced to a tangible form." The discussion in that case was referring to documentary evidence, such as "transcripts of deposition testimony" or "photographs." See id. The case did not extend the rule regarding findings based on documentary evidence to include all forms of physical evidence.

[7] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" See Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

does not apply to subsidiary findings based on documentary evidence extends to the criminal context as well.

We emphasize, however, that this does not give appellate courts carte blanche with respect to fact finding. "[A]s our long-standing jurisprudence makes plain, in no event is it proper for an appellate court to engage in what amounts to independent fact finding in order to reach a conclusion of law that is contrary to that of a motion judge who has seen and heard the witnesses, and made determinations regarding the weight and credibility of their testimony." Jones-Pannell, 472 Mass. at 438, citing Clarke, 461 Mass. at 340-341, and cases cited.

b. Suppression of statements. In order for a defendant's statements to be admissible at trial, the Commonwealth bears the "particularly heavy burden" of proving beyond a reasonable doubt that the defendant's Miranda waiver was valid. See Hoyt, 461 Mass. at 152, citing Commonwealth v. Day, 387 Mass. 915, 920 (1983). A waiver is valid when it is made "voluntarily, knowingly, and intelligently." Hoyt, supra at 153. This determination is based on the "totality of the circumstances, including the characteristics of the accused and the details of the interrogation." Id. "[T]he judge may consider, among other things, the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal

justice system," Commonwealth v. Anderson, 445 Mass. 195, 203 (2005), as well as his "outward behavior,"[8] Commonwealth v. Sarourt Nom, 426 Mass. 152, 159 (1997).

The Commonwealth does not appear to have presented evidence concerning most of the aforementioned factors, such as age, education, or intelligence, nor did the judge address them. The evidence primarily concerned the defendant's outward behavior and demeanor, particularly with regard to his intoxication. The judge, in turn, concentrated his findings and conclusions on the defendant's level of intoxication, without establishing the nexus between the defendant's intoxication and his ability validly to waive his rights. Expressly relying on the audio-video recording, the judge concluded that the defendant was "quite intoxicated" during the second interview, and inferred that the defendant therefore must have been even more intoxicated during the first interview.

i. The recording. As the recording is documentary evidence, the judge's findings drawn from it are not entitled to deference and we may review such evidence de novo. See, e.g., Commonwealth v. Monroe, 472 Mass. 461, 464 (2015) (recorded interrogation constitutes documentary evidence); Clarke, 461

---

[8] The fact that the defendant's waiver was documented in writing is not dispositive; the validity of a waiver depends on the totality of the circumstances. See Commonwealth v. Magee, 423 Mass. 381, 387 n.8 (1996).

Mass. at 341 (same); Hoyt, 461 Mass. at 148 (same).  We take a view quite different from what the motion judge did as to what the recording reveals about the defendant's condition.

As the judge noted, at the beginning of the audio-video recording, the defendant was a bit unsteady on his feet when he was led into the interrogation room; this unsteadiness dissipated quickly, however.  For example, the defendant was able to stand and pantomime hitting the victim repeatedly, without any instability or stumbling.  He also spoke coherently; as he entered the interrogation room he was clearly arguing with the officers about the warrant for his arrest, and was insisting that it was a "straight warrant" rather than a "default."

The recording also shows that the defendant was paying attention while Stratton reviewed the Miranda rights, and told Stratton he already knew what Stratton was going to say.  The defendant did not "play" with Stratton's pen and paper, as the judge found, but rather grabbed them while stating that he would sign the Miranda waiver form again.  He indicated that he understood each right and remembered his earlier waiver, stating "I understand everything. . . .  I initialed everything, I signed it, and I dated it."  When Stratton asked if the defendant understood that he had a right to remain silent, he exclaimed, "I'll tell you whatever you want!"

Throughout the recording, the defendant was very responsive to questions. He was able to recall details of the incident, such as times, locations, and the specific bus he took, and even corrected a few of Stratton's statements. His account of hitting the victim repeatedly in the head was consistent with his statements during the first interview, and he made some of the same incriminating statements. When Stratton asked for the defendant's friend's last name, he declined to provide it. The defendant also minimized his culpability, insisting that he only hit the victim in the face with an open hand, and that he had her permission to be in the apartment and had not stolen her keys.

The defendant was cooperative and cordial throughout the interview, but when asked pointed questions about the victim, his demeanor would become more grave and reticent, and he made statements such as, "It shouldn't have happened," and "I fucked up." Thus, although the defendant repeatedly asked when he would be released, and disputed the technicalities of the prior outstanding warrant, he also, contrary to the judge's findings, understood the gravity of the situation. In addition, he understood that he had incriminated himself; regarding the victim's condition, he made statements such as, "You're not going to let me go now, are ya?"; "I'm going to jail, aren't I?"; and "Are you going to charge me with something?"

In sum, our de novo review of the audio-video recording reveals that, during the second interview, the defendant's demeanor was lucid, coherent, and responsive, and he appeared to be in control of his mental faculties. Although intoxication "bears heavily on the validity of a Miranda waiver," and there is no dispute that the defendant drank at least some alcohol in the hours prior to his arrest and interrogation, intoxication is "insufficient alone to require a finding of involuntariness" (citation omitted). See Wolinski, 431 Mass. at 231. See also Holton v. Boston Elevated Ry. Co., 303 Mass. 242, 246 (1939) ("Liquor affects individuals in various ways," and "it is sometimes difficult to determine degrees of intoxication"). In this case, the recording demonstrates that the defendant's level of intoxication at that point did not appear to impede his capacity knowingly, intelligently, and voluntarily to waive his rights during the second interview.

This conclusion, however, is not sufficient to resolve the matter.[9] The recording captured the defendant's condition more

---

[9] The Commonwealth contends that the defendant validly waived his rights before both interviews. The recording instead demonstrates that at the start of the second interview, the defendant and the officers simply reviewed the waiver form he signed during the first interview. In any event, even if the defendant had waived his rights at the start of the second interview, the Commonwealth would still be required to prove beyond a reasonable doubt that the first, unrecorded waiver was valid. "In this Commonwealth, there is a presumption that a

than one hour after he had made the waiver, when the effects of his intoxication presumably had declined to an unknown extent. Unlike in Clarke, 461 Mass. at 337 n.1, 338-340, 343, and Novo, 442 Mass. at 263, 267-268, where the audio-video recordings were dispositive, here the recording itself does not show the defendant's condition when he made the waiver and cannot be conclusive. We must accordingly consider the recording in light of the "entire evidence," Berry, 304 Mass. at 57-58, to determine whether the Commonwealth met its heavy burden. Hoyt, 461 Mass. at 152.

ii. The entire evidence. "It is the motion judge's responsibility to make credibility assessments, weigh the evidence, and make findings of fact; it remains the responsibility of an appellate court to evaluate whether those findings are clearly erroneous." See Jones-Pannell, 472 Mass. at 431 n.3. In this regard, it is also the motion judge's

---

statement made following the violation of a suspect's Miranda rights is tainted, and the prosecution must show more than the belated administration of Miranda warnings in order to dispel that taint" (quotations and citation omitted). Commonwealth v. Osachuk, 418 Mass. 229, 235 (1994). "This presumption may be overcome by showing that either: (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag." Id. Here, the second interview began ten to twenty minutes after the first interview ended; this is insufficient to constitute a "break in the stream of events." See id.

responsibility to find adequate facts pertinent to the matter at hand; those facts "should be stated clearly, concisely and unequivocally, and be worded so that they are not susceptible of more than one interpretation." Isaiah I., 448 Mass. at 339.

Our ability fairly to assess the entirety of the evidence in this case is complicated by two factors. First, we do not know the extent to which the recording had an impact on even those findings that did not expressly rely on it. Second, the judge failed to address certain testimony plainly material to the issue before him, calling into question the adequacy of the facts found to support his conclusion as to the ultimate issue in this case, i.e., the defendant's capacity validly to waive his Miranda rights at the time of the first interview.

As to the first complicating factor, to the extent the judge expressly relied on the recording of the second interview to make findings concerning the defendant's condition during the unrecorded first interview, these findings must be set aside in light of our independent assessment of the recording. To the extent that the judge made findings about the defendant's condition that do not rest on the recording, they are drawn from oral testimony and are entitled to deference. See Clarke, 461 Mass. at 341. We cannot know the extent to which the recording may have had an impact on these findings, however, and are unable to evaluate how, if at all, our de novo review of the

recording might alter the judge's view of the testamentary evidence. Additionally, we cannot know whether the judge would have reached different credibility determinations had he shared our view of the defendant's condition at the second interview.

As to the second complicating factor, our ability fairly to evaluate the entirety of the evidence is compromised by the inadequacy of the findings made as to certain material matters. For example, the judge credited police officer testimony that, at the crime scene, approximately one hour before the first interview, the defendant was talking and mumbling to himself repeatedly, and yelling statements loudly at the officers such as, "What's going on in there?"; "I know what happened"; and "She was my friend." This testimony is not self-explanatory, however, and the judge made no further findings regarding what, if any, relationship this bore to the defendant's condition at the time of the first interview.

Further, the judge did not address certain oral testimony by the same police witnesses that was plainly material to the ultimate issue in this case. This would include their testimony that the defendant did not appear intoxicated at the crime scene, and that the defendant was cooperative, lucid, articulate, and even strategic in answering questions during the first interview. In addition to not making any findings as to

this testimony, the judge also did not make any express credibility determinations as to these three police witnesses.

The judge's prefatory statement that he credited the officers' testimony "to the extent it [was] consistent with [his] explicit findings of fact" does not relieve him of his obligation to make adequate findings.  Of course, motion judges need not make findings with respect to every piece of evidence in the record, irrespective of pertinence.  It is understandable that busy trial court judges will use brief, prefatory language as shorthand to indicate that they are aware that the record contains additional testimonial evidence, but find only certain portions of the testimony credible or relevant.[10]  See Jones-Pannell, 472 Mass. at 431 n.3.  While such prefatory language precludes supplementation of the findings by the reviewing court, it does not insulate such findings from being reviewed for their adequacy.  Id.

Here, the portion of the officers' testimony that was omitted from the judge's findings was the only evidence directly

---

[10] We are not unaware that the widespread use of such prefatory language also may have arisen in response to perceived appellate overreaching in the form of augmented or substituted fact finding, often to reach a different outcome from that reached by the trial court.  Such perceived overreaching may occur when the reviewing court supplements findings by relying upon apparently uncontroverted witness testimony of record that has not been otherwise specifically discredited by the trial court judge.  See Jones-Pannell, 472 Mass. at 432.

addressing the defendant's condition during the unrecorded first interview.  As such, it warranted the judge's attention.  While the credibility of this testimony was for the motion judge alone to assess, the testimony should have been addressed, and not ignored.  This omission unnecessarily impairs our ability on the entire evidence to evaluate whether the judge's findings adequately support his ultimate conclusions of law.

Nevertheless, appellate courts must not overstep our boundaries by substituting our view of the testamentary evidence, appearing in a cold transcript, for that of the motion judge who, as it were, "eyeballed" the witnesses when in a unique position to assess credibility.  See Jones-Pannell, 472 Mass. at 438, citing Clarke, 461 Mass. at 340-341, and cases cited.  Given this, we have little alternative but to remand the matter for further fact finding, despite the fact that remand is ordinarily disfavored; it comes at the expense of court and litigants' resources and time, and prolongs proceedings.  Here, however, remand is prudent to ensure that the judge will have an opportunity to make findings regarding all pertinent evidence in light of our assessment of the recording of the second interview.  It will also give the judge an opportunity to clarify the nexus, if any, between the defendant's intoxication and his capacity to make a valid waiver during the relevant period.  Cf. Jones-Pannell, 472 Mass. at 437 ("where the facts

as found are susceptible of more than one interpretation, and there is additional evidence in the record, neither implicitly credited nor discredited by the judge, remand may be appropriate" [quotation and citation omitted]); Isaiah I., 448 Mass. at 338 (remand for further fact finding necessary where judge's findings omitted certain evidence and it was unclear whether omission was result of credibility determination or clear error).

Because of the unusual circumstances here, including the factors complicating our ability fairly to assess the entire evidence, this case is the exception, not the rule. Now, as before, what is needed from a trial court judge are credibility determinations as to pertinent matters, and concise, clear, and adequate findings of fact. See Isaiah I., 448 Mass. at 339. This will allow a reviewing court to evaluate whether the findings are clearly erroneous and whether they support the judge's ultimate findings and conclusions of law.

c. Voluntariness of statements. Remand also is appropriate here because the judge made no separate findings concerning the voluntariness of the defendant's statements. "Due process requires a separate inquiry into the voluntariness of [a defendant's statement] apart from the validity of the Miranda waiver" (citation omitted). Commonwealth v. Morales, 461 Mass. 765, 776 (2012). This is necessary in order to ensure

that the statements were "free and voluntary" and "not the result of inquisitorial activity that had overborne his will." Id. "Relevant factors include, but are not limited to, promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings" (quotation and citation omitted). Id. On remand, the judge therefore should assess separately the voluntariness of the defendant's statements.

d. Suppression of clothing and forensic testing. "The Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights] provide that every person has the right to be secure against unreasonable searches and seizures of his or her possessions" (quotation and citation omitted). Commonwealth v. White, 475 Mass. 583, 587 (2016). Warrantless searches and seizures are presumptively unreasonable, but may be justified if the Commonwealth can demonstrate that the search or seizure "falls within a narrow class of permissible exceptions to the warrant requirement" (quotation and citation omitted). Id. at 588. For instance, police may seize a defendant's clothing incident to arrest if

they have "probable cause to believe that the [clothing] was connected to the crime." Commonwealth v. Robles, 423 Mass. 62, 66 (1996). "[P]robable cause requires a substantial basis for concluding that the items sought are related to the criminal activity under investigation" (quotations and citations omitted). Commonwealth v. Kaupp, 453 Mass. 102, 110 (2009).

In this case, the defendant's clothing was validly seized incident to his arrest. The officers had probable cause to arrest the defendant even in the absence of his incriminating statements. See Commonwealth v. Williams, 422 Mass. 111, 119-120 (1996) (because arrest was proper, police were permitted to seize as evidence clothing and shoes worn by defendant at time of arrest); Commonwealth v. Gliniewicz, 398 Mass. 744, 750 (1986) ("Once a defendant has been arrested and is in custody, clothing that constitutes evidence may be taken from him").

Specifically, although the defendant initially was arrested at the crime scene pursuant to a warrant for failure to register as a sex offender, police also had probable cause at that time to arrest him for the victim's death. That arrest took place after police observed him standing outside the apartment where the victim's body had been found, shouting that he knew the victim and knew what had happened to her. The officers knew that the defendant had been involved in prior incidents of domestic violence involving the victim, at the same address, and

his proximity to the victim's apartment indicated that he was in violation of the abuse prevention order.  Since the officers could have arrested the defendant for murder at the crime scene, their later observation[11] of apparent bloodstains on his socks and shoes provided a substantial basis to conclude that his clothing contained evidence of the victim's death.  See Robles, 423 Mass. at 66-67 (defendant's coat properly seized incident to arrest where police observed bloodstains on it and defendant was wearing same clothes he had worn on night of murder).

Once the defendant's clothing was properly seized, the officers did not need a separate warrant for forensic testing. We repeatedly have rejected such a requirement in the context of clothing.  See Robles, 423 Mass. at 65 n.8; Commonwealth v. Varney, 391 Mass. 34, 38-39 (1984).  While an individual has a reasonable expectation of privacy in the clothes he or she is wearing, that expectation dissipates once the clothes are lawfully in the possession of the police.  See Arzola, 470 Mass. at 816-817.  At that point, clothing is more comparable to latent fingerprints.  Id.  In such cases, the "DNA analysis is not a search in the constitutional sense."  Id. at 820.  See Commonwealth v. Aviles, 58 Mass. App. Ct. 459, 463 (2003)

---

[11] The officers first noticed the bloodstained clothing during the booking process after they had arrested the defendant for murder following the second interview.

("where the police have lawfully obtained evidence, it may be subjected to scientific testing").

The judge's reliance on Kaupp, 453 Mass. at 106 n.7, was misplaced. That case concerned forensic analysis to search the contents of a computer that was seized pursuant to the exigent circumstances exception to the warrant requirement. It is inapposite here, particularly as the search of a computer can produce significantly more information than basic forensic testing of clothing. See Commonwealth v. Keown, 478 Mass. 232, 239 (2017), cert. denied, 138 S. Ct. 1038 (2018) ("Searches of the many files on electronic devices . . . must be done with special care and satisfy a more narrow and demanding standard than searches conducted in the physical world" [quotations and citation omitted]). Compare Varney, 391 Mass. at 41 ("A white powder, unlike a film, is not a communicative medium. A warrantless scientific examination by government agents of white powder lawfully obtained and plainly visible may confirm the fact that it is contraband . . . [but] does not, in our view, implicate any Fourth Amendment privacy interest"). Accordingly, the suppression of the results of forensic testing of the defendant's clothing is reversed.

3. Conclusion. So much of the judge's order requiring suppression of the results of forensic testing of the defendant's clothing is reversed. So much of the judge's order

requiring suppression of the defendant's statements is remanded for further factual findings, reconsideration of legal conclusions in light of the further findings, and other proceedings consistent with this opinion.

<u>So ordered</u>.