APPEALS COURT 
 
 COMMONWEALTH vs. LUIS MORALES

 
 Docket:
 24-P-784
 
 
 Dates:
 March 11, 2025 – November 12, 2025
 
 
 Present:
 Desmond, Ditkoff, & Englander, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Firearms. Practice, Criminal, Motion to suppress. Threshold Police Inquiry. Constitutional Law, Search and seizure, Reasonable suspicion. Search and Seizure, Threshold police inquiry, Reasonable suspicion.
 
 

  
      Indictments found and returned in the Superior Court Department on August 10, 2023.
      A pretrial motion to suppress evidence was heard by Michael P. Doolin, J.
           An application for leave to prosecute an interlocutory appeal was allowed by Frank M. Gaziano, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.
           Darcy A. Jordan, Assistant District Attorney, for the Commonwealth.
      Dennis M. Toomey for the defendant.
      DESMOND, J.  The Commonwealth filed this interlocutory appeal from an order allowing the motion to suppress of the defendant, Luis Morales.  The defendant was arrested after Boston police received an anonymous tip from a private citizen who purportedly witnessed a person waving a firearm while walking on a public way in broad daylight.  On appeal, the Commonwealth argues that the motion judge erred by failing to conclude (1) that the witness's tip was reliable; and (2) that the tip was sufficient to furnish the police with reasonable suspicion that the defendant was unlawfully possessing a firearm and using it in a threatening manner.  We affirm.
      Background.  The following facts are drawn from the judge's findings and from undisputed evidence in the record that he implicitly credited.  See Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018); Commonwealth v. Jones-Pannell, 472 Mass. 429, 436 (2015).
      On May 15, 2023, at approximately 11:54 A.M., a 911 dispatcher received a call from an unidentified civilian witness.  The dispatcher informed the witness that the call was being recorded.  The witness reported that, while driving on Woodrow Avenue in Dorchester, she saw a person who had "just waved a gun."  The witness described the person as a Black man in his early twenties with "lighter tone" skin who was wearing a white T-shirt, black jeans, a backpack on the front of his body, and a black mask.  The witness also stated that the man had a slim build and was approximately five feet, four to five feet, five inches tall.
      When the dispatcher asked the witness for more details regarding how the man was handling the firearm, the witness said "I saw him reaching out of, like, his, his backpack.  He had it, like, out of the backpack visible."  The dispatcher inquired if the man was pointing the gun at anyone and the witness said, "No.  I just saw him grabbing it out of his backpack, like, waving it around outside of his backpack."  The witness also stated that the man was walking by himself as no one else was around him.
      The witness supplied the dispatcher with inconsistent statements regarding the person's location.  First, she stated that the man was on Woodrow Avenue walking toward Theodore Street.  However, the dispatcher pointed out that Woodrow Avenue and Theodore Street do not intersect.  The witness then told the dispatcher that the man was at the bottom of Woodrow Avenue and Winston Road -- two streets that also do not intersect.  At the end of the call, the dispatcher asked the witness to provide her name and telephone number but told her she did not have to do so.  The witness declined.
      Two minutes after the initial call ended, the dispatcher placed a return call to the number from which the witness just called, to try to ascertain additional information about the suspect's location.[1]  The witness then told the dispatcher that the person was by Winston Road and Theodore Street.  The dispatcher asked the witness if she would be willing to talk to someone to point out which way the person had gone.  The witness declined to do so but offered that the person was "going in the direction of, like, towards Norfolk Street and everything."  The second call then ended.
      Several minutes after the initial call, Boston police officers James Dunn and Kevin Shelley, who were driving in the same police vehicle, saw the defendant near the corner of Woodrow and Mountain Avenues.  The defendant, who has light skin and is in his twenties but is several inches taller than the witness's description of the suspect, was wearing a white T-shirt, black pants, and a black mask, and was carrying a backpack on the front of his body.  Dunn and Shelley pulled the police vehicle behind the defendant and told him to stop.  The defendant immediately fled from the police and dropped the backpack.  Dunn gave chase on foot, while Shelley remained with the backpack, which was later searched and found to contain a firearm.  During the chase, the defendant dropped the black mask.  Dunn eventually apprehended the defendant and placed him under arrest.  The officers asked the defendant questions without reading him his Miranda rights.  The defendant stated that he did not have a gun or a license to carry one.  Ultimately, the defendant was charged with offenses related to the unlawful possession of the firearm discovered in the backpack.
      Discussion.  1.  Basis of knowledge and reliability.  "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (quotations and citation omitted).  Jones-Pannell, 472 Mass. at 431.
      To justify a warrantless investigatory stop, the police must have reasonable suspicion that the person they stop "has committed, is committing, or is about to commit a crime."  Commonwealth v. Silva, 366 Mass. 402, 405 (1974).  "Reasonable suspicion 'must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience.'"  Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 8 (2023), quoting Commonwealth v. Gomes, 453 Mass. 506, 511 (2009).  Where, as is the case here, "the reasonable suspicion calculus turns on the reliability of the anonymous tip, . . . 'our evaluation of the tip's indicia of reliability will be focused on the informant's reliability and his or her basis of knowledge,'" Commonwealth v. Sertyl, 101 Mass. App. Ct. 836, 840 (2022), quoting Commonwealth v. Lyons, 409 Mass. 16, 19 (1990) -- the so-called "Aguilar-Spinelli" factors.  See Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964).  The two prongs of this analysis may also be referred to as the "basis of knowledge test" and the "veracity test."  See Commonwealth v. Depina, 456 Mass. 238, 243 (2010).  The basis of knowledge prong is satisfied where the caller "was describing her own firsthand observations."  Commonwealth v. Westgate, 101 Mass. App. Ct. 548, 552 (2022).
      However, in a reasonable suspicion case, "[e]stablishing the veracity prong where an anonymous 911 caller is involved is less straightforward, as no evidence regarding his or her past reliability or honesty typically will be available." Commonwealth v. Manha, 479 Mass. 44, 46 (2018).  "Independent police corroboration may make up for deficiencies in one or both of these factors."  Lyons, supra.
      Here, the motion judge found that the anonymous witness's basis of knowledge was adequately established because the witness saw the person with the firearm firsthand and gave a detailed description of the person to the dispatcher.  However, because the police corroborated only innocent details that were observable by any bystander, and because the tip did not provide any predictive details of the person's behavior or of any criminal activity that was about to occur, the motion judge concluded that the Commonwealth could not establish that the witness's tip was sufficiently reliable, and therefore the tip could not supply the police with reasonable suspicion necessary to stop the defendant.  We now address the Commonwealth's arguments regarding the reliability of the tip.
      The Commonwealth first argues that the judge erred by treating the witness as an anonymous tipster rather than as an identifiable citizen, whose tip should have been evaluated for reasonable suspicion under the relaxed Aguilar-Spinelli test.  In support of this argument, the Commonwealth asserts that when the dispatcher called the witness back, the witness was then on notice that "she had made herself traceable and available to the police by making the first call, and that despite this, she willingly engaged in the second conversation with the dispatcher and repeated information shared in the first call."
      It is well settled that "the reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources" (citation omitted).  Manha, 479 Mass. at 46-47.  "The same is true for callers who are aware that their calls are being recorded and that their telephone numbers can be traced."  Id. at 47.  However, a caller who believes the call is anonymous is not accorded the reliability of a caller who believes they can be identified, because a caller who believes they are anonymous will not be deterred by the risk of being charged with false reporting.  Id. at 47 n.1.  "[E]ven if the police are able to recover the telephone number and identity of 911 callers, . . . [i]t is the tipster's belief in anonymity, not its reality, that will control his behavior" (quotation and citation omitted).  Commonwealth v. Depiero, 473 Mass. 450, 455 (2016).
      Here, as the motion judge noted, although the caller "was made aware that the 911 call was being recorded, . . . [t]here is no evidence that the anonymous caller in this case knew that her phone number could be traced at the time she made the report concerning the individual with the firearm."  Contrast Commonwealth v. Costa, 448 Mass. 510, 511 (2007) (anonymous caller made aware before she provided tip that police had identified telephone number from which she was calling).  Additionally, while the Commonwealth asserts that after receiving the second call the witness then "knew that the police had identified her as the initial caller and that she had made herself traceable and available to the police," she said nothing about a gun in the second call and specifically declined to meet with officers.  Furthermore, nothing in the record suggests that during the second call the witness was made aware that the police had obtained any information, other than the phone number she used to call 911, that would place her anonymity at risk.  See Manha, 479 Mass. at 47 n.1 ("it is the caller's belief of anonymity, not his or her actual anonymity, that will predict his or her behavior").  Notably, the witness did not supply the dispatcher with any identifying information during either call or offer to make herself available to police in any other way and elected to remain anonymous.  See Depiero, 473 Mass. at 455.  Contrast Commonwealth v. Cox, 56 Mass. App. Ct. 907, 909 (2002) (anonymous 911 caller who reported seeing erratic driver assisted police patrol officer by pointing at moving truck, flashing her car lights at truck, and ultimately pulling over to speak with officer after stop).  Thus, the motion judge did not err in evaluating the tip as one that was made from an anonymous source.  See Commonwealth v. Gomes, 458 Mass. 1017, 1018-1019 (2010).
      2.  Evidence of a crime.  Addressing the judge's conclusion that the tip, even if reliable, did not create reasonable suspicion that a crime was being or about to be committed, the Commonwealth contends that the tip alone furnished the police with reasonable suspicion that the person was illegally possessing a firearm or "that the suspect's handling of the firearm posed a public threat."  Specifically, the Commonwealth asserts that the witness's observations that the person wore a mask, carried the firearm in a backpack on the front of his body, and removed the firearm from the backpack and waved it around were enough to supply the police with reasonable suspicion of a crime.  We are not persuaded.
      As the motion judge noted, while the Commonwealth can establish a caller's reliability through independent police corroboration, "[c]orroboration of purely innocent details that are observable by any bystander . . . provides only limited enhancement to the reasonable suspicion determination."  Commonwealth v. Pinto, 476 Mass. 361, 365 (2017).  Furthermore, even in a reasonable suspicion case where the reliability of an anonymous caller can be established, "[a] tip must be reliable 'in its assertion of illegality, not just in its tendency to identify a determinate person.'"  Sertyl, 101 Mass. App. Ct. at 840, quoting Gomes, 458 Mass. at 1019.  Because "[c]arrying a gun is not a crime," Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996), "[a]n anonymous tip that someone is carrying a gun does not, without more, constitute reasonable suspicion to conduct a stop and frisk of that individual."  Commonwealth v. Barros, 435 Mass. 171, 177 (2001).  Rather, reasonable suspicion "may arise where there is an 'indication (in the tip or otherwise) of a threat to [someone's] physical well being,' i.e., an 'imminent threat to public safety.'"  Gomes, supra, quoting Alvarado, supra at 271, 274.[2]
      Here, the parties agree that the stop of the defendant occurred when the officers told the defendant to stop after "initially encountering him near Mountain and Woodrow Avenues."  Before initiating the stop, Dunn and Shelley had corroborated only innocent details about the person described in the 911 call, such as his clothing and his general location.  See Pinto, 476 Mass. at 365.  While the Commonwealth cites Commonwealth v. Karen K., 491 Mass. 165 (2023), and Commonwealth v. Matta, 483 Mass. 357 (2019), for the proposition that the witness's description of how the person was handling the firearm supplied the police with reasonable suspicion to justify the stop, both of those cases are distinguishable.[3]  Each involved instances where police officers, prior to conducting a stop, made independent observations of the defendant that were consistent with the unlawful possession of a firearm based on the officer's training and experience.  See Karen K., supra at 169, 175 (officer saw juvenile who "'bladed' her body 'so as to conceal something on her person" once she saw police, an act "characteristic of an individual who is carrying an illegal firearm" according to officer's specialized training).  See also Matta, supra at 365-367 ("judge credited the officer's testimony that, based upon the officer's experience, people who carry unlicensed firearms often carry them inside a waistband, and that the officer became concerned that the defendant was carrying an unlicensed firearm when the defendant adjusted the right side of his waistband using both hands"; this provided reasonable suspicion combined with defendant's walking toward bushes and then taking flight, "[a]lthough the question is a close one").  Unlike in Karen K., supra, and Matta, supra, there was nothing in the suspect's actions here, as relayed by the witness, that could have suggested to the officers that the gun she saw was unlicensed.  Similarly, although waving a gun at or around people could pose a threat to the public (the only ground argued by the Commonwealth beyond unlawful possession), simply waving a gun with nobody around does not.
      Because Dunn and Shelley made no observations of a gun or suspicious handling thereof before stopping the defendant, the police were unable to corroborate the witness's tip in its assertion of potential illegality -- namely, the unlawful possession of a firearm or the use of a firearm in a threatening manner.  Thus, the tip alone was inadequate to furnish the police with reasonable suspicion to stop the defendant.  See Sertyl, 101 Mass. App. Ct. at 840.
      The Commonwealth also argues that the motion judge erred by relying in part on Gomes, 458 Mass. at 1019, to conclude that the defendant's motion should be allowed.  In Gomes, supra, the Supreme Judicial Court found that an anonymous tip that a man standing on a street pointing a gun in the air did not create an imminent threat to public safety, and therefore did not supply police with reasonable suspicion to conduct an investigatory stop, where there was no evidence that "the gun had been fired, pointed at another person, or otherwise handled in a way that posed a threat to someone."  Likewise, in this case, while the witness's report was off-putting, there was no evidence that the person had fired the gun or was handling it in a manner that posed a threat to someone.  The witness stated that the person was not pointing the gun at anyone and was walking alone on the street.  The Commonwealth attempts to distinguish Gomes, supra, by pointing out that the motion judge in Gomes discredited testimony that the defendant was "waving a gun around" and instead found that he was just holding the gun in the air.  Id. at 1018 n.1.  However, in a similar fashion, the motion judge here found the witness's characterizations of what the person was doing with the firearm were inconsistent.  For example, while the witness did state that she saw the person wave the gun, she also said that "[h]e had it, like, out of the backpack visible."  Therefore, we cannot say that the motion judge's finding that the witness inconsistently described how the person was handling the gun was clearly erroneous.[4]  Thus, the motion judge properly relied on Gomes, supra, in allowing the defendant's motion.
      3.  Conclusion.  Because the reliability of the anonymous tip was not established and the tip did not describe criminal activity, we are constrained to conclude that the police did not have reasonable suspicion to justify stopping the defendant.  The police, of course, could have investigated the tip by, for example, surveilling the defendant or approaching him without immediately seizing him, to see how he would have reacted.  We conclude only that police could not command the defendant to "stop" on the basis of the tip alone.  Thus, the judge's order allowing the defendant's motion to suppress is affirmed.
                                                
 
So ordered.
footnotes for dissenting

      ENGLANDER, J. (dissenting).  If the majority is correct, the law of reasonable suspicion in this Commonwealth has gone seriously awry.  A man is witnessed "wav[ing] a gun," on a residential street, by an ordinary civilian passing by in a car.  The civilian is understandably concerned.  She calls 911.  Her description of the man is quite good -- she describes his shirt and pants color, that he has a backpack on the front of his body, and that he is masked.  She is less able to identify location, so two minutes after the first call ends, the police call her back for clarification.  The civilian answers her cell phone and attempts to provide better information as to the gun waver's location.
      The majority concludes that the above information was not sufficient for the police to go and find the gun waver, and to direct him to stop so that they might ask him some questions.  I find that conclusion startling.  What would one have the police do?  Nothing?  The man was objectively a potential threat to public safety.  His gun was not in a holster, where it might lawfully be (if he had a license); he was "waving it around."  He was on a thickly-settled public street, where he could have been (and was) witnessed by others, who might well reasonably find such conduct threatening.[1]  As in Terry v. Ohio, 392 U.S. 1, 23 (1968), "[i]t would have been poor police work indeed" for the police not to investigate, and to exercise a limited police power to stop the man, to see if and how he responded to questions.
      The majority reaches its conclusion by drawing on a mixed-up set of legal concepts, found (unfortunately) in some of our case law.  The law need not be so confused.  Ever since Terry, the courts have recognized that the police may stop a person on the street based on information that does not amount to probable cause.  See Terry, 392 U.S. at 27.  We use the term "reasonable suspicion" to describe this lesser quantum.  It is a "low bar."  Commonwealth v. Privette, 491 Mass. 501, 551 (2023) (Wendlandt, J., concurring).  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) ("minimal level of objective justification" sufficient for reasonable suspicion).  To put this in perspective, probable cause itself is "not a high bar."  Commonwealth v. Guastucci, 486 Mass. 22, 26 (2020), quoting District of Columbia v. Wesby, 583 U.S. 48, 57 (2018).  Probable cause is less than a preponderance of the evidence.  Commonwealth v. Murphy, 95 Mass. App. Ct. 504, 509 (2019).  Reasonable suspicion is materially lower still.  Commonwealth v. Castillo-Martinez, 104 Mass. App. Ct. 22, 25 (2024), quoting Kansas v. Glover, 589 U.S. 376, 380 (2020) (proof of wrongdoing required for reasonable suspicion "obviously less than is necessary for probable cause").  Reasonable suspicion must amount to "more than a hunch"; objective facts are required.  Privette, supra at 507.  But the law of reasonable suspicion is and should be practical.  See Commonwealth v. Westgate, 101 Mass. App. Ct. 548, 551 (2022), quoting Commonwealth v. Gonzalez, 93 Mass. App. Ct. 6, 11 (2018) (reasonable suspicion analysis is conducted "in an ordinary, commonsense manner without hypertechnical analysis").  The police intrusion on the ordinary citizen when one is simply stopped, and questioned, is not great.[2]  That is all the police did here -- requesting that the defendant stop -- before the defendant fled, leaking contraband as he ran.
      The majority does not recognize that reasonable suspicion is a low bar.  The majority also applies the Aguilar-Spinelli test as if it were looking for probable cause.[3]  But this is not a probable cause case, and the Aguilar-Spinelli test does not determine reasonable suspicion.  Rather, as the Supreme Judicial Court acknowledged in Commonwealth v. Lopes, 455 Mass. 147, 155-156 (2009), quoting Commonwealth v. Lyons, 409 Mass. 16, 19 (1990), the Aguilar-Spinelli concepts of "basis of knowledge" and "reliab[ility]," to the extent they are relevant, are applied in a "less rigorous" manner in a reasonable suspicion analysis.
      The point is important:  the Aguilar-Spinelli test is a test for probable cause; because reasonable suspicion is a lesser standard, the test logically does not apply to determine reasonable suspicion, and indeed, that is what the Supreme Judicial Court has said.  Rather, the reasonable suspicion test is relaxed, drawing more on common sense than on the details courts too often get mired in, when analyzing the intricacies of the basis of knowledge and reliability tests.  See Westgate, 101 Mass. App. Ct. at 551.
      The majority thus errs (1) in failing to recognize that reasonable suspicion is a low bar, and (2) in analyzing the issue as if Aguilar-Spinelli applies full bore.  But the error runs deeper.  At bottom, the reasonable suspicion analysis requires an objective evaluation of the quality of the information available to the police when the police effected the stop.  See Lyons, 409 Mass. at 19-20.  I acknowledge that the concepts of "basis of knowledge" and "reliability" are helpful touchpoints in this evaluation, but they are not to be applied in a mechanical, rote manner.  Ultimately, the word we are construing and applying is "unreasonable," an accessible word penned by John Adams in art. 14 of the Massachusetts Declaration of Rights.  It must be applied with a healthy dose of common sense.
      Here the majority concludes that the information the police received from this ordinary civilian was not sufficiently "reliable" for the police to take the minimally intrusive act of asking the defendant to "stop."  But in what way was the information not sufficiently reliable?  The caller was a civilian driving down the road.  Upon seeing a person waving a gun she acted entirely reasonably; she called 911.  The majority attempts to paint her as an "anonymous tipster," see ante at   , but she was not.  She made her phone number available to the police.  When they called back, she answered and provided more information.  This was not someone trying to hide her identity, nor a confidential informant.  Drawing on the doctrine of those cases is simply a mistake.  See Westgate, 101 Mass. App. Ct. at 552, quoting Commonwealth v. Costa, 448 Mass. 510, 515 (2007) ("[T]he reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources").  Nor was the caller relaying hearsay.  It is frankly a stretch to say that this caller "elected to remain anonymous," ante at   , where the caller initiated contact with the police and then responded, at some length and helpfully, to the dispatcher's return call.[4]  It is in society's interest to encourage 911 calls such as the ones at issue, not to discourage them by hamstringing the police from acting -- by employing a complex analysis that is inconsistent with the context of an officer "on the beat."[5]  An ordinary civilian who calls 911, provides relatively detailed and relatively consistent information, and explains that she knows the information because she has personally witnessed it, is not unreliable for purposes of a reasonable suspicion analysis.  See Commonwealth v. Manha, 479 Mass. 44, 46-47 (2018) (identifiable civilian informers more reliable than anonymous tipsters).
      In short, the police here had reasonable suspicion to stop the defendant, and his Federal and State constitutional rights were not violated.  To the extent any of our case law suggests otherwise,[6] it is at odds with the basic rules laid down in Terry and its progeny and followed, generally, in our courts as well.  I respectfully dissent.
          [1] Although the witness did not provide her telephone number to the dispatcher, the dispatcher was able to call her back.
          [2] "There is no 'firearm exception' to the general rule barring investigatory stops and frisks on the sole basis of an anonymous tip."  Gomes, supra at 1018, citing Florida v. J.L., 529 U.S. 266, 272-274 (2000).
               [3] The Commonwealth cites to our decision in Commonwealth v. Karen K., 99 Mass. App. Ct. 216, 222 (2021), but that was superseded by the Supreme Judicial Court; the distinction makes no practical difference given that the court agreed with our analysis.
          [4] Finally, we disagree with the Commonwealth that the motion judge "parsed the evidence too finely" in his analysis of the witness's reliability.  Rather, the motion judge considered the events in full context.
          [1 ]I accordingly disagree that the 911 call did not sufficiently describe potential "criminal activity," ante at   , so as to justify a simple stop; at the least, the defendant's actions justified investigation based on concern that the defendant might commit (or had committed) assault.  The majority states that there was "nobody around" the defendant, but that is not accurate.  The area is thickly settled, and it was noontime.  The caller herself was "around."  Other traffic can be seen on the officer's bodycam video footage, as can another civilian, just as the officer pulls up next to the defendant.
          [2] A person who is stopped by the police is, of course, under no obligation to respond to questioning.  See Commonwealth v. Rivera, 482 Mass. 145, 151 (2019).  Furthermore, the nature of the questioning must be proportional to what is known, and last no longer than necessary to that end.  See Commonwealth v. Harris, 93 Mass. App. Ct. 56, 63 (2018).  See also Terry, 392 U.S. at 25-26 (search justified by reasonable suspicion must "be strictly circumscribed by the exigencies which justify its initiation").  There is no suggestion in this record that the stop was based on the defendant's race or ethnicity, factors that would give the intrusiveness of a stop an additional and more serious dimension.  See Commonwealth v. Long, 485 Mass. 711, 739-740 (2020).
      [3] Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964).
          [4] I note that although the 911 operator did ask if the caller wished to provide her name, the operator immediately followed up by saying "You don't have [to] if you don't want to."
          [5] The majority concludes by suggesting that the police "could have investigated the tip by . . . approaching [the defendant] without immediately seizing him, to see how he would have reacted" -- while at the same time holding that the police "could not command the defendant to 'stop[.]'"  The suggestion is as impractical as it is legally untenable.  Passing the point that the word "unreasonable" does not admit of such fine distinctions, the man was seen waving a gun only minutes before.  The majority's rule for responding to this tip would strip the police of authority to control the situation, and thus lacks a practical appreciation of how police officers must reasonably be allowed to act.  Cf. Terry, 392 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties").
               [6] I do not read the rescript opinion in Commonwealth v. Gomes, 458 Mass. 1017 (2010), as requiring a different result.  Gomes addresses a tipster who was entirely anonymous, and who provided no basis for knowing the behavior of the defendant that the tipster reported.  See id. at 1018-1019.  This case is not Gomes. 
           The other cases on which the majority relies also do not control this case, and I note in any event that they do not necessarily trace a straight line.  Commonwealth v. Pinto, 476 Mass. 361 (2017), is clearly distinguishable, as in that case there was no information as to the source of the tip.  Commonwealth v. Barros, 435 Mass. 171 (2001), did not involve waving a gun.  In Commonwealth v. Matta, 483 Mass. 357 (2019), the court found reasonable suspicion.